Mark REIFF, Plaintiff,

v.

**INTERIM PERSONNEL, INC., a corporation, Sharon Wienandt, and Larry Johnson, Defendants.**

**Civil No. 3–94–1564.**

United States District Court,
D. Minnesota,
Third Division.

Oct. 11, 1995.

Mark W. Gehan and Bonnie J. Bennett, Collins, Buckley, Sauntry & Haugh, Saint Paul, Minnesota, for plaintiff.

John D. Nelson and James M. Zappa, Dorsey & Whitney P.L.L.P., Minneapolis, Minnesota, for defendants.

MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### Introduction

Before the Court is Defendants' Motion for Summary Judgment. For the reasons stated below, Defendants' Motion is granted.

### Background

Plaintiff Mark Reiff ("Reiff") was hired as a full-time client services manager in March 1992 by Defendant Interim Personnel, Inc.

("Interim"). Reiff Dep. at 15–16; Complaint ¶ V.[1] Interim Personnel, Inc. ("Interim") is a wholly owned subsidiary of Interim Services, Inc., and has its corporate headquarters in Fort Lauderdale, Florida, with branch offices in Minneapolis, St. Paul, Brooklyn Park, Burnsville, and Edina. Def.'s Mem. in Supp. of Mot. for Summ.J. 1–2. Reiff interviewed with Larry Johnson ("Johnson"), branch manager of Interim's office in Edina. Complaint ¶ III; Johnson Dep. at 19–20. Reiff also met with Interim's Twin Cities Area Director, Sharon Wienandt ("Wienandt"), in applying for the job. Reiff Dep. at 13–15. Reiff's principal responsibility consisted of helping Interim's clients to fill their staffing needs. Reiff Dep. at 16–18.

In late October 1992, Reiff was diagnosed with aplastic anemia. Reiff Dep. at 39; Complaint ¶ VII. Reiff was immediately hospitalized after being diagnosed with this condition, in which the bone marrow fails to produce necessary blood products; the anemia required that Reiff be given repeated transfusions of blood and platelets. Reiff Dep. at 42–45. After Reiff was discharged from the hospital, he returned to work for a short period of time, and then was hospitalized again. Reiff Dep. at 53. Reiff's medical condition forced him to take a leave of absence that supposedly started on November 30, 1992. *Id.*[2]

In approximately January of 1993, Reiff submitted an application for long-term disability benefits to Interim's insurance carrier, North American Life Assurance Company ("NAL"). *Id.* at 183–84 (mistakenly labeled North American Life Insurance Company). Reiff's claim was accepted, but the record offers conflicting accounts of when payments commenced. Defendants claim that payments started in December 1992, and this date is supported by letter from NAL dated November 1, 1994. Reiff Dep., Ex. 30; Zappa Aff. ¶ 5. Another letter from NAL dated March 19, 1993 implies that payments began on January 30, 1993. Bennett Aff., Ex. B, at 1. Reiff contends that he did not receive any payments from NAL until March 1993. Reiff Dep. at 195. In any event, Reiff continued to receive and accept checks until December 1994. *Id.* at 200; Zappa Aff. ¶ 5 and Exs. 13–24.

Plaintiff's principal physician, Dr. F. Bruce Lewis, represented to NAL that Reiff was totally disabled beginning on October 1, 1992, in a statement sent to NAL in January 1993. Reiff Dep., Ex. 12, at 2; Zappa Aff. ¶ 5. Dr. Lewis also advised NAL that plaintiff remained totally disabled in February 1994. Bennett Aff., Ex. E; Zappa Aff., Ex. 3.

1. Defendants reference an "Amended Complaint" in their memorandum, and the record contains an Amended Answer (Doc. No. 8) by Defendants that answers the allegations in the "Amended Complaint." The "Amended Complaint" has not been filed with the Clerk's Office and does not constitute part of the record before this Court. This Court must thus refer to the original Complaint. A copy of what is purported to be the Amended Complaint is attached to the Affidavit of James M. Zappa, and the Court notes that the only change between the "Amended Complaint" and the original Complaint is the addition of certain information in Count XVI which is not germane to this Motion for Summary Judgment. (Plaintiff purportedly received a second right to sue letter dated March 6, 1995 on his second charge of discrimination with the Equal Employment Opportunity Commission and the Minnesota Department of Human Rights.) The Court notes that, while it does not affect the outcome of this Motion, if the "Amended Complaint" had named new parties or alleged new causes of action, the Court would not have subject matter jurisdiction over the new claims, resulting in dismissal. The Court is also troubled by reliance on Defendants' Amended Answer (Doc. No. 8), since, although it has been properly filed, it refers directly to the allegations in the "Amended Complaint." However, the Court notes that the Amended Answer differs from the original only in the addition of two new theories of defense that are not reached by the Court in its opinion. Id. ¶¶ 30 and 31 (Plaintiff's ADA claims against individual Defendants are untimely, and all Plaintiff's claims are barred by his misrepresentation of employment history). In any case, the Court notes that some authority does exist for relying on an amended responsive pleading that refers to a document not in the record. *See Carter v. Church,* 791 F.Supp. 297 (M.D.Ga.1992) (motion to strike defendants' supplemental answers denied when amended complaint had neither been filed nor served, but plaintiff allowed to file amended complaint beyond original deadline).

2. For some reason, Defendants state that Reiff's leave of absence commenced on November 20, 1992. Def.'s Mem. 3. The Court has not been directed to any evidence in the record that the leave of absence began on this date, and thus uses the date in Reiff's deposition testimony.

**1284**

Defendants claim Reiff was terminated on January 29, 1993, because he was medically unable to return to work. Defs.' Mem. 4; Reiff. Dep., Ex. 9A. Reiff claims that he was never informed of the termination, and, as of the date of the deposition, still considered himself an Interim employee. Reiff Dep. at 67–68; Pl.'s Mem. in Opp'n to Summ.J. 3.

In January 1994, Reiff visited Wienandt in the Edina office and told her that he was feeling better and wanted to return to work. Reiff Dep. at 71; Complaint ¶ VIII. Wienandt told Reiff that there were no positions currently available, but that she felt some positions would become open in the coming months. Reiff Dep. at 71. Reiff sought employment with other employers in early 1994. Reiff Aff. ¶ 6.

Reiff visited Interim's Edina office twice more in early 1994. In late February, he went into the office and asked branch manager Johnson about advertisements that he had seen in the newspaper; Johnson told him to talk to Wienandt, because she had placed the ads in the paper. Reiff. Dep. at 78–80. He talked to Wienandt, who did not offer him any position; Reiff did not apply for any specific position during this visit. *Id.* at 80–83 and 93. Reiff avers that Wienandt gave him several reasons why Reiff was not being offered one of the advertised positions, one of them being that Reiff "may have developed some bad habits in [his] absence." *Id.* at 80.

Reiff then visited the office again in March, April, or May of 1994. Reiff Dep. at 89. Again he was not offered a position, and did not fill out an employment application, although he did let Wienandt know that he was interested in coming back to work for Interim. *Id.* at 82; 85–87; and 93.

Reiff also visited Interim's Brooklyn Park branch office in the early months, possibly April, of 1994 to discuss a temporary position. Reiff Dep. at 85 and 89. Janet Fischer, the branch manager, offered him the temporary job, without requesting Reiff to fill out an application. Fischer Dep. at 25–28 (Bennett Aff., Ex. L). Reiff declined to take the position because it did not provide insurance benefits. *Id.* at 28–29.

Reiff filed his initial charge of discrimination with the Minnesota Department of Human Rights and the EEOC on September 19, 1994. Zappa Aff., Ex. 5. On March 2, 1995, he filed a second charge that named Johnson and Wienandt as defendants. Zappa Aff., Ex. 6. After receiving right-to-sue letters, Reiff filed a Complaint in state court, alleging that Defendants had violated the Americans with Disabilities Act ("ADA") and the Minnesota Human Rights Act ("MHRA"). Compl. ¶¶ I–XXIII.

This action was removed to federal court on December 12, 1994. This Court has federal question jurisdiction under 28 U.S.C. § 1331 concerning the ADA claim, and has jurisdiction over all other claims by virtue of 28 U.S.C. § 1441(c).

## Analysis

### I. Summary Judgment Standard

■ Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. Under that Rule:

> [summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

■ The party moving for summary judgment bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The evidence of the non-moving party is to be believed and all justifiable inferences are to be drawn in a light most favorable to that party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1357, 89

L.Ed.2d 538 (1986); *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. Where a moving party, with whatever it provides the court, makes and supports a motion for summary judgment in accordance with Rule 56, a party opposing the motion may not rest upon the allegations or denials of its pleadings; rather, the adverse party's response must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514. *See also Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir.1995).

In resolving a summary judgment motion, the court need only determine whether the record, as identified by the parties, shows the existence of a real controversy over a material issue, such that the controversy must be resolved by the finder of fact at trial. In opposing the summary judgment motion, the nonmovant cannot merely point to some alleged factual dispute between the parties. Instead, any fact alleged to be in dispute must be "outcome determinative under prevailing law," that is, it must be material to an essential element of the specific theory of recovery at issue. *See Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir.1992) (citation omitted).

The Court notes, as do Defendants, that Reiff incorrectly asserts that he is not obligated to prove his prima facie case in order to survive summary judgment. The United States Supreme Court has stated that summary judgment is appropriate against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552; *see also Krenik*, 47 F.3d at 957–59. Yet the Court also notes that summary judgment is appropriate in employment discrimination cases only "in those rare instances where there is no dispute of fact and where there exists only one conclusion." *Johnson v. Minnesota Historical Soc.*, 931 F.2d 1239, 1244 (8th Cir.1991).

## II. Reiff's Claims and Applicable Law

In Count I of his Complaint, Reiff charges that Defendants have violated the MHRA by refusing to hire him because of his disability. Compl. ¶¶ XV. The Act makes it "an unfair employment practice" to "refuse to hire or to maintain a system of employment which unreasonably excludes a person seeking employment" because of, among other things, a physical disability. Minn.Stat. § 363.03, subd. 1(2)(a) (1994). The Act defines disability as:

> any condition or characteristic that renders a person a disabled person. A disabled person is any person who (1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment.

Minn.Stat. § 363.01, subd. 13 (1994).

In Count II of the Complaint, Reiff claims that Johnson and Wienandt aided and abetted discrimination against him in violation of both Minn.Stat. § 363.03, subd. 1(2) and subd. 1(6). Compl. ¶ XVIII and XIX. Subdivision 1(6) states that it is an unfair employment practice for certain employers "not to make reasonable accommodation to the known disability of a qualified disabled person or job applicant" unless it would impose an undue hardship on the employer. Minn. Stat. § 363.03, subd. 1(6) (1994). A "qualified disabled person" is defined as "with respect to employment, a disabled person who, with reasonable accommodation, can perform the essential functions required of all applicants for the job in question." Minn.Stat. § 363.01, subd. 35(1) (1994).

In Count III, Reiff alleges a violation of the ADA, specifically citing 42 U.S.C. § 12112(a), which states that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, hiring, advancement, or discharge of employees...." Compl. ¶ XXI. A qualified individual with a disability is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (1994).

## III. The Proper Framework

█ The United States Supreme Court established a process for evaluating discrimination claims under Title VII in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), that has been consistently followed by courts in determining claims under the ADA, *see, e.g., Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 57–58 (4th Cir.1995) and *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994), as well as the MHRA, *see, e.g., Sigurdson v. Carl Bolander & Sons, Inc.*, 532 N.W.2d 225, 227 (Minn. 1995). Reiff and Defendants appear to agree that *McDonnell Douglas* controls. Pl.'s Mem. in Opp'n 8; Defs.' Mem. 10–11. Under the *McDonnell Douglas* framework, Reiff must prove for his prima facie case: 1) that he is a member of a protected class; 2) that he applied and was qualified for the job; 3) that Defendants rejected him, despite his qualifications; and 4) that the position remained open and the employer continued to seek applicants. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Ennis*, 53 F.3d at 58; *Sigurdson*, 532 N.W.2d at 227. It is undisputed that the plaintiff must carry this burden, even at the summary judgment stage. *Id.* at 228. If he cannot present evidence that creates a genuine fact issue as to each element of his prima facie case, Defendants argue, Reiff's claims must fall victim to Defendants' Motion for Summary Judgment.

█ But first, this Court must determine whether the "mixed-motive" analysis laid out in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) is applicable. The *McDonnell Douglas* test applies in the absence of "direct evidence" of discrimination, while the *Price Waterhouse* standards come into play when "an employee produces direct evidence that an illegitimate criterion" was considered in the employment decision. *Beshears v. Asbill*, 930 F.2d 1348, 1353 (8th Cir.1991). In such a "mixed-motive" case, the plaintiff still bears the burden of proving at trial that an illegitimate factor, such as the employee's or applicant's disability, was a motivating factor in the adverse employment decision. *Rada-baugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 448 (8th Cir.1993) (citing *Beshears*, 930 F.2d at 1353).

One case, outside of this Circuit, has applied the *Price Waterhouse* framework to a claim under the ADA. *Doe v. Kohn Nast & Graf, P.C.*, 862 F.Supp. 1310, 1317 (E.D.Pa. 1994) (applying *Price Waterhouse* in retaliatory discharge case under ADA). More generally, courts have stated that "direct evidence" may be used by a plaintiff to prove his or her case in a disability discrimination claim. *See Wagner v. Kester Solder Co.*, 1995 WL 399484 (N.D.Ill.1995); *see also De-Luca v. Winer Indus., Inc.*, 53 F.3d 793, 797 (7th Cir.1995). Recent ADA cases decided by the Eighth Circuit, however, do not mention *Price Waterhouse*, yet there is no indication in those cases that the plaintiffs claimed they possessed direct evidence of discrimination. *Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1112–14 (8th Cir.1995); *Wooten v. Farmland Foods*, 58 F.3d 382, 385–86 (8th Cir.1995).

█ As a district court of this circuit has noted, ADA cases utilizing the *Price Waterhouse* framework are difficult if not impossible to find, but there is no analytical reason why a proper plaintiff could not successfully mount such a claim under the ADA. *Hutchinson v. United Parcel Serv., Inc.*, 883 F.Supp. 379, 399 (N.D.Iowa 1995). That court noted that the language of the ADA and the Title VII language at issue in *Price Waterhouse* are similar, and thus, both provisions appear "to be amenable to similar interpretation." *Id.* at 399 n. 9. That court further noted, however, that the *Price Waterhouse* "mixed-motive" analysis was codified as relating to gender in the 1991 amendments to the civil rights statutes, but no amendment of this type was made to the ADA. *Id.* at 399 n. 10. This court feels that whether or not it has been codified under the ADA, the *Price Waterhouse* standard should apply to proper claims, based on direct evidence of discrimination, under the ADA as well as Title VII and the Age Discrimination in Employment Act. This conclusion is supported by the fact that the Eighth Circuit has held that *Price Waterhouse* requires district courts to make a finding concerning

whether other types of employment discrimination cases involve mixed motives, thus implicating *Price Waterhouse. Stacks v. Southwestern Bell Yellow Pages, Inc.,* 996 F.2d 200, 202 (8th Cir.1993); *see also Sargent v. Paul,* 16 F.3d 946, 949 n. 7 (8th Cir.1994).

 The Court accordingly must look to see if Reiff has produced sufficient direct evidence of discrimination to qualify for *Price Waterhouse* treatment. One remark by Wienandt that Reiff considers "direct evidence" is certainly anything but. Wienandt allegedly told Reiff that he would be considered for a position only on a temporary basis because Reiff "may have picked up some bad habits in his absence." Reiff Dep. at 78–89. Reiff contends that Weinandt "had to be commenting on his disability," but this conclusion smacks of a suspect, self-serving, and unwarranted interpretation instead of direct evidence. Pl.'s Mem. in Opp'n 7–8.

The other remark put forth by Reiff requires examination. One of Reiff's co-workers, Sue Hurd ("Hurd"), testified that she had a discussion with Johnson, the Edina branch manager, about Reiff's physical status and whether Reiff would return to work. Hurd testified in her deposition:

There was only one time that there was a discussion. Larry said something about our insurance is just skyrocketing or something like that because of Mark Reiff. That was brought up just once about insurance.

Bennett Aff., Ex. M (Hurd Dep.), at 60. Hurd further testified about the details of the conversation:

Q. I believe you testified that you—that conversation occurred in the office, the Edina branch, correct?

A. Yes.

Q. Can you specify if it was in a conference room or any more specific area other than the office itself?

A. There's a possibility it was in his office when we were talking about other things.

Q. Tell me everything you can about that particular conversation, what you aid, what he said, to the best of your recollection today, ma'am?

A. Within the midst of the conversation it was about Mark Reiff. He had been gone for a period of time, I don't know for how long, and I was questioning as to his update as to his sickness and asking if he sees that he's ever going to return again. And in the conversation it was just something about the way his insurance is skyrocketing. He just brought that into play. And I don't recall exactly, he just said something about the insurance is just skyrocketing on us. And I don't recall any more than that as far as what more was said.

Q. So is it fair for me to say based upon the context of this conversation you believe that he made this statement in relation to Mr. Reiff's illness?

A. Yes.

*Id.* at 78–79.

 The Eighth Circuit has laid out the criteria for determining whether the plaintiff has presented sufficient "direct evidence" to qualify for *Price Waterhouse* treatment. Direct evidence is defined to exclude "stray remarks in the workplace," "statements by nondecisionmakers," or "statements by decisionmakers unrelated to the decision process itself." *Beshears,* 930 F.2d at 1354 (citing *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. at 1804 (O'Connor, J., concurring)). The court continued:

While we agree that "stray remarks" will not suffice to invoke the *Price Waterhouse* formula this Court has held that "[d]irect evidence may include evidence of actions or remarks of the employer that reflect a discriminatory attitude." ... Comments which demonstrate a "discriminatory animus in the decisional process" ... or those uttered by individuals closely involved in employment decisions may constitute direct evidence within the meaning of *Price Waterhouse.*

*Beshears,* 930 F.2d at 1354 (citations omitted).

A brief discussion of what courts have found to be "direct evidence" is illuminating. In *Radabaugh,* corporate planning documents prepared by the president of the company stated that the company's strengths

included "young managers"; this statement constituted direct evidence. 997 F.2d at 449. In *EEOC v. Alton Packaging Corp.*, 901 F.2d 920, 924 (11th Cir.1990), a decision cited by the *Beshears* court, direct evidence was found where one of two decisionmakers had said he would not hire blacks if it were his company. Finally, in *Beshears* itself, a remark by the company president to the effect that older employees have problems adapting to changes and to new policies was sufficient to constitute direct evidence. 930 F.2d at 1354.[3]

■ On the other hand, discriminatory comments not related to the decisional process do not compel an analysis under *Price Waterhouse*. For example, a memorandum that did not directly and substantially address employees' age, but rather the fact that some current managers had resisted the company's reorganization, written by a manager who did not take any part in the terminations at issue, was held not to constitute direct evidence. *Bialas v. Greyhound Lines, Inc.*, 59 F.3d 759, 762–64 (8th Cir.1995). Moreover, references by a decisionmaker to an employee as "the old man" did not constitute direct evidence, and did not allow the employee's claim to qualify for *Price Waterhouse* treatment. *Philipp v. ANR Freight Sys., Inc.*, 61 F.3d 669, 674 (8th Cir.1995).

■ Additionally, the plaintiff in an employment discrimination case cannot rest on mere presentment of statements alleged to exhibit a discriminatory bias. "Under *Price Waterhouse*, plaintiff carries the threshold burden of showing that an illegitimate criterion was a motivating factor in the employer's decision to terminate her employment." *Cram v. Lamson & Sessions Co.*, 49 F.3d 466, 471 (8th Cir.1995) (citations omitted). The Eighth Circuit's reasoning, of course, applies with equal force in a refusal-to-hire context. To make this showing, the plaintiff must present

> evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflect-

ing the alleged discriminatory attitude ... sufficient to permit the factfinder to infer that that attitude was more likely than not a motivating factor in the employer's decision.

*Radabaugh*, 997 F.2d at 449 (quoting *Ostrowski v. Atlantic Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir.1992)).

■ It is this Court's finding that Johnson's alleged concern over rising insurance costs does not constitute direct evidence. Plaintiff asks this Court to infer discriminatory animus from this statement, and subsequently infer that this discriminatory animus was a motivating factor in the decision not to hire him. From this vague statement, one which the deponent cannot date accurately, this Court cannot infer that Johnson possessed a discriminatory attitude that was "more likely than not a motivating factor" in the decision not to rehire Reiff—in other words, no "specific link" between the alleged discriminatory animus and the challenged decision has been demonstrated. *See Philipp*, 61 F.3d at 674. Plaintiff has shown no evidence of a connection between this single remark and the rejection of his informal requests for employment after his hospitalization and recovery. Thus, this Court finds *Price Waterhouse* inapplicable here, although *Price Waterhouse* may apply to an ADA claim in a proper situation. Absent direct evidence, as both parties recognize, the Court must turn to the *McDonnell Douglas* standard discussed *supra*.

## IV. Reiff as a Member of a Protected Class

■ To establish a prima facie case under *McDonnell Douglas*, the plaintiff must first prove that he or she is a member of a protected class. *Ennis*, 53 F.3d at 58. Defendants argue that Reiff cannot claim that he was a member of the class protected under the ADA at the time in question because of his representations to Interim's insurance carrier, North American Life. Thus, he cannot prove, or even raise a dispute of

---

**3.** The Eighth Circuit in *Stacks* noted that, in a hornbook sense, the evidence described in *Beshears* as "direct" requires an inferential step from the statement itself to the conclusion that a dis-criminatory motive played a role in the employment decision; thus, such "direct" evidence can be properly classified as circumstantial in nature. *Stacks*, 996 F.2d at 201 n. 1.

material fact as to, one element of his prima facie case.

When Reiff applied for benefits in January 1993, he made a long-term disability claim. Reiff. Dep, 184–85, 191; Exs. 10 and 11. Both Reiff and Dr. Lewis signed a statement that categorized Reiff as totally disabled. Reiff Dep., Ex. 11. The Initial Statement of Disability, also signed by Reiff, instructed Reiff to notify NAL immediately if his medical condition improved so that he would be able to return to work. Reiff Dep., Ex. 10, at 3. Reiff stated in his deposition that he had read the material contained in this Statement. Reiff Dep. at 208. The benefit policy itself states that a claimant is only entitled to the long-term Total Disability Benefit if one is totally disabled, meaning that the claimant is unable "to perform the material and substantial duties of his or her own job during the Benefit Waiting Period plus the next 24 months ... due to Injury or Sickness which requires regular care of a Physician." Zappa Aff., Ex. 1, at 6.1(a) and 6.3(a).

Dr. Lewis represented to NAL that Reiff was totally disabled, and unable to work, on three occasions: first, at the time of his initial application in January 1993. Reiff Dep., Ex. 10, at 3; *see also* Zappa Aff., Ex. 8; Zappa Aff., Ex. 9, at 4. Second, in July 1993, Dr. Lewis again told NAL that Reiff was unable to work and that it was unknown when Reiff could return to work. Zappa Aff., Ex. 10. Third, on February 1, 1994, Dr. Lewis told NAL that he thought Reiff's disability was still total, and that Reiff's prospects for recovery were far from certain. Zappa Aff., Ex. 3. Defendants point out that Reiff authorized Dr. Lewis to provide NAL with statements concerning Reiff's medical condition for the duration of his claim. Reiff Dep., Ex. 10, at 3.

Reiff admits that he received and cashed monthly benefit checks from NAL from early 1993 through December 1994. Reiff Dep. at 195–201; *see also* Reiff Dep., Exs. 13–24. Reiff did not inform NAL of his improved condition and his search for work. Reiff Dep. at 195 and 208.

Basically, Defendants argue, Reiff cannot establish that he could perform the essential functions of any position he sought during early 1994—he was accepting benefits from NAL that he could only receive if he were "unable to perform the material and substantial duties" of his job. Thus, Reiff is unable to establish himself as a "qualified individual with a disability" under the ADA as a matter of law. Defs.' Mem. at 11–13.

The argument is a persuasive one, and it has convinced a number of courts to decide in Defendants' favor. In *Garcia–Paz v. Swift Textiles, Inc.*, 873 F.Supp. 547 (D.Kan.1995), the court granted summary judgment to the defendant on an ADA claim in very similar circumstances. The plaintiff had submitted a claim for long-term disability benefits, stating that she qualified since she could "not perform each of the material duties of [her] regular occupation." *Id.* at 555. On the basis of such representations to the defendant's insurance carrier, as well as the Social Security Administration, she received long-term disability benefits. In her ADA claim, she alleged that, with accommodations, she could have performed the material duties of her job during the same time period in which she was receiving benefits. The court found that plaintiff was estopped from asserting that she could have performed the main functions of her job in her ADA claim, and thus could not meet the definition of a "qualified individual" under the ADA. The court concluded:

Plaintiff, her counsel, and her physician have consistently represented that as of that date, because of injury or sickness, she has been unable to perform each material duty of her regular occupation. Having collected substantial benefits, based on these unambiguous and seemingly informed representations, plaintiff is estopped from now claiming that she *could* perform the essential functions of her position.

873 F.Supp. at 555 (emphasis in original) (footnote omitted).

In the same vein, the plaintiff in *Reigel v. Kaiser Foundation Health Plan*, 859 F.Supp. 963 (E.D.N.C.1994) repeatedly certified that she was unable to perform the essential functions of her positions, and received disability payments on the basis of

these assertions. In holding that plaintiff had failed to satisfy a necessary element of her prima facie case, the court stated

> Plaintiff in the case *sub judice* cannot speak out of both sides of her mouth with equal vigor and credibility before this court. Plaintiff now seeks money damages from the Medical Group on her assertion that she was physically willing and able to work during the same period of time that she was regularly collecting disability payments on her assertions that she was physically unable to work.

*Id.* at 970.

Aside from these two cases discussed by Defendants, this Court has found numerous other cases which directly support Defendants' desired result. *See Cheatwood v. Roanoke Indus.,* 891 F.Supp. 1528, 1537–38 (N.D.Ala.1995) (plaintiff cannot make out prima facie case under ADA since he could not be "a qualified individual with a disability" when he testified that he could not perform essential functions of his job); *Parker v. Metropolitan Life Ins. Co.,* 875 F.Supp. 1321, 1325–26 (W.D.Tenn.1995) (claimant who could not work was not "qualified individual with a disability" under ADA and thus could not make out prima facie case); *McNemar v. Disney Stores, Inc.,* 1995 WL 390051 (E.D.Pa.1995), at *3–4 (claimant cannot claim to be "qualified individual with a disability" under ADA because of previous representations of total disability); *Berry v. Norfolk S. Corp.,* 1995 WL 465819 (W.D.Va.1995) (plaintiff's representations of total and permanent disability estop him from asserting ADA claim, since he cannot be "qualified individual with a disability"). *See also Judith K. Grubbs, Inc. v. Medical Facilities of Am., Inc.,* 879 F.Supp. 588 (W.D.Va.1995) (holding patient was not otherwise qualified under Rehabilitation Act when patient received subacute care Medicare payments and then claimed she did not require that level of care); *Larkins v. CIBA Vision Corp.,* 858 F.Supp. 1572, 1583 n. 5 (N.D.Ga.1994) (finding merit in defendant's claims that plaintiff could not perform essential functions of her job based on her admissions that she could not work).

The rationale of these decisions is bolstered by the reasoning of *Beauford v. Father Flanagan's Boys' Home,* 831 F.2d 768 (8th Cir.1987), *cert. denied,* 485 U.S. 938, 108 S.Ct. 1116, 99 L.Ed.2d 277 (1988), in which the Eighth Circuit considered a claim under the Rehabilitation Act, the ADA's predecessor. The plaintiff's claim was considered invalid because she did not come within the definition of a "qualified handicapped person" in the applicable Department of Health and Human Services regulations—the regulation defined a "qualified handicapped person," with respect to employment, as a person who, "with reasonable accommodation, can perform the essential functions of the job in question." *Id.* at 771. Since plaintiff admitted that she could not perform those essential functions, she was held not to meet the prerequisites of protection under the regulations. *Id.; see also August v. Offices Unlimited, Inc.,* 981 F.2d 576, 581–83 (1st Cir.1992) (where record indicated that claimant was totally disabled, claimant could not contend that he was covered by Rehabilitation Act for reasons expressed above).

Cases cited as support by Reiff are not persuasive since they concern a distinguishable fact situation. In *Overton v. Reilly,* 977 F.2d 1190, 1196 (7th Cir.1992), the Seventh Circuit found that an award of Social Security disability benefits was not inconsistent with an employee's claim that he was able to perform his job. As Defendants and the *Overton* court itself recognize, however, the qualification standard for Social Security disability benefits does *not* require that one be unable to work. In other words, a finding of disability under the Social Security Administration standards "is consistent with a claim that the disabled person is 'qualified' to do his job under the Rehabilitation Act." *Id.* The court explained:

> First, the SSA may award disability benefits on a finding that the claimant meets the criteria for a listed disability, without inquiring into his ability to find work within the economy.... Second, even if the SSA had looked into Overton's ability to find work in the national economy, its inquiry would necessarily be generalized. The SSA may determine that a claimant is unlikely to find a job, but that does not

mean that there is no work the claimant can do. In sum, the determination of disability may be relevant evidence of the severity of Overton's handicap, but it can hardly be construed as a judgment that Overton could not do his job at the EPA.

*Id.* *See also Smith v. Dovenmuehle Mortgage, Inc.*, 859 F.Supp. 1138, 1141 (N.D.Ill. 1994) (citing *Overton* and recognizing that award of disability benefits did not mean that recipient was unable to find work; SSA's decision to award benefits "not synonymous with a determination that plaintiff [was] not a 'qualified individual' under the ADA."); *Kupferschmidt v. Runyon*, 827 F.Supp. 570, 574 (E.D.Wis.1993) (citing *Overton* and recognizing that finding of disability by SSA should not be given preclusive effect in Rehabilitation Act case).

In this case, Reiff represented, by his own statements and through his authorized physician, that he could not perform the substantial and material duties of his job, and thus being "totally disabled" and was entitled to long-term disability benefits. The ADA defines a "qualified individual with a disability" as someone who is able to "perform the essential functions of the position" that he or she holds or desires. 42 U.S.C. § 12111(8). Unlike *Overton* and the other cases, these assertions must be mutually exclusive.

This Court has found three cases that lend at least some credibility to Reiff's position in the face of the very considerable negative precedent discussed above. First, a district court denied judgment for a defendant as a matter of law in a similar situation, where the plaintiff and his physician had described himself as totally disabled on several occasions, and where plaintiff had received disability benefits from an insurance company. *Anzalone v. Allstate Ins. Co.*, 1995 WL 35613 (E.D.La.1995). However, the court does not recite the standard for receiving the disability benefits, so its impossible to tell whether the language is mutually inconsistent with ADA standards. Also, as is not the case with Reiff, the plaintiff in *Anzalone* "consistently took the position that he was capable of working in the field under certain restrictions." *Id.* at *2.

Second, from the same district, a court denied summary judgment to the defendant, citing *Anzalone* as support, because there was significant contrary evidence of plaintiff's ability to work in the record. *Oswald v. Laroche Chems., Inc.*, 894 F.Supp. 988 (E.D.La.1995). In this case, Dr. Lewis has stated that Reiff was able to return to work sometime in 1994. Bennett Aff., Ex. C. Reiff testified as much. *See* Reiff Dep. at 196–97. Reiff's own statements that he was looking for work in January 1994, his situation having improved somewhat, and that he was ready to go back to Interim furnish at least some contrary evidence. *See, e.g.,* Reiff Dep. at 71, 196. Yet this Court cannot discount: 1) Reiff's acceptance of disability benefits; 2) the representations that he and his authorized physician made to NAL; and 3) the fact that the acceptance of the checks and the representations made are directly and indisputably at odds with his present claim. As another distinguishing feature, *Oswald* involved a fact-intensive question of whether the plaintiff's doctor properly assessed plaintiff's ability to perform the functions of a modified position that is not present in Reiff's situation. 894 F.Supp. at 996–97.

Finally, a Missouri state court has seemed to adopt Reiff's position, but the decision was made under a Missouri act comparable but not identical to the ADA. *Daffron v. McDonnell Douglas Corp.*, 874 S.W.2d 482, 486–87 (Mo.Ct.App.1994) (under Missouri law, fact that appellant applied for disability benefits and stated he was "totally disabled" was not dispositive of whether he was capable of performing job duties; appellant could still be considered "handicapped" under language of statute).

Reiff attempts to avoid the largely unfavorable precedent by relying on the fact that, from February 1994 onward, neither Dr. Lewis nor Plaintiff himself represented to NAL that he was totally disabled, noting that NAL did not inquire about Reiff's condition again until November 1994. Pl.'s Mem. in Opp'n 5–6; Bennett Aff., Ex. O. The time period for the claim in question ends in April 1994, or perhaps May 1994, since that is the last possible time that Reiff indicated any

interest in employment with Interim. Reiff Dep. at 87–90. This leaves Reiff a window of opportunity to assert that he could have worked, thus qualifying under the ADA, and still was not hired, for a period of approximately two to three months. However, the fact remains that Reiff continued to accept the checks from NAL that explicitly hinged on his previous representations that he was unable to perform the material and substantial functions of his job.

■■■ The Court finds that Reiff did not qualify for protection under the ADA during the relevant time period, and thus cannot point to a genuine issue of material fact as to one element of his prima facie case under *McDonnell Douglas*. Therefore, summary judgment for Defendant is appropriate on Reiff's ADA claims.

## V. Reiff's Minnesota Human Rights Act Claims

Reiff fares no better with regard to his claims under the MHRA. Reiff does not distinguish the MHRA from the ADA in his papers, but the fact remains that Minn.Stat. § 363.03, subd. 1(2)(a) does *not* specifically refer to a "qualified disabled person" when making it an unfair employment practice to discriminate against a person on the basis of a disability. The pertinent section makes it an unfair practice to refuse to hire *anyone* on the basis of a disability. The "qualified disabled person" language is only found in Minn.Stat. § 363.03, subd. 1(6), where certain employers are required to make reasonable accommodation for qualified people with disabilities (i.e. people who can perform the essential functions required for the job). All three of the counts in Reiff's Complaint implicate Minn.Stat. § 363.03, subd. 1(2), and only one mentions subdivision 1(6).[4]

Yet a close reading of the Minnesota Human Rights Act only avails Plaintiff so much. First, still in the literalist mode, subdivision 1 of this section contains the proviso "[e]xcept

when based on a bona fide occupational qualification." It might well be argued that an ability to work is a bona fide occupational qualification, and that, by his acceptance of the benefits and representations as late as February 1994, Reiff has demonstrated his inability to work. *Cf. Elbers v. Growe*, 502 N.W.2d 810, 815 (Minn.Ct.App.1993). Any other interpretation would have employers violate the MHRA if they did not hire an applicant on the basis that the applicant was so disabled so as to be unable to perform any work at all—an absurd result. Second, Minnesota courts have followed federal fair employment practices statutes and federal case law in construing the MHRA. *See, e.g., Sigurdson*, 532 N.W.2d at 227. More specifically, Minnesota courts have relied upon interpretations of the Rehabilitation Act, the ADA's predecessor, in construing the disability provisions of the MHRA. *See, e.g., State by Cooper v. Hennepin County*, 441 N.W.2d 106, 110 (Minn.1989); *cf. Elbers v. Growe*, 502 N.W.2d 810, 814 (Minn.Ct.App.1993).[5] Third, the Eighth Circuit has recently considered the utilization of federal precedent appropriate when construing the MHRA, because of the paucity of case law on the MHRA. *McAdams v. United Parcel Serv., Inc.*, 30 F.3d 1027, 1029 n. 3 (8th Cir.1994). *See also Heise v. Genuine Parts Co.*, 900 F.Supp. 1137, 1153–54 (D.Minn.1995) (stating that Minnesota law parallels ADA, so analysis under federal ADA standards controlled MHRA claim). Finally, both parties have relied solely on federal case law when discussing this particular issue in their papers before the Court, and seem to agree that claims brought under the MHRA and the ADA are assessed under the same federal standards.

In accordance with the reasoning above, this Court finds that Reiff's MHRA claims must fail along with his ADA claims, and does not proceed to discuss Defendants' other defenses. There is no factual dispute that is "outcome determinative under prevailing

---

4. The claim under subdivision 1(6) thus cannot stand.

5. The case seemed to draw a distinction between a plaintiff's MHRA and ADA claims, making a point of only addressing the allegations under the

MHRA. *Elbers*, 502 N.W.2d at 814. The Court is reluctant to base a ground-breaking decision on a single instance where, it must be noted, the ADA was not even discussed since it was not a claim before the trial court.

law," *Get Away Club,* 969 F.2d at 666; thus, summary judgment may be appropriately granted for Defendants on all claims.

## Conclusion

Accordingly, based on the foregoing, and all the files, records and proceedings herein, **IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. No. 9) is **GRANTED,** as Plaintiff's Complaint is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**