Anthony A. BRAZIEL, Plaintiff,

v.

LORAM MAINTENANCE OF WAY, INCORPORATED, Defendant.

Civ. No. 3–95–388.

United States District Court,
D. Minnesota,
Third Division.

July 9, 1996.

James H. Kaster, John A. Fabian, III, Nichols Kaster & Anderson, Minneapolis, MN, for Anthony A. Braziel.

Joseph Walter Hammell, Linda M. Mealey–Lohmann, Dorsey & Whitney, Minneapolis, MN, for Loram Maintenance of Way, Inc.

## MEMORANDUM ORDER

ERICKSON, United States Magistrate Judge.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to the consent of the parties, as authorized by Title 28 U.S.C. § 636(c)(3), upon the Defendant's Motion for Summary Judgment.

A Hearing on the Motion was held on January 25, 1996, at which time the Plaintiff appeared by John A. Fabian, Esq., and the Defendant appeared by Joseph W. Hammell, Esq.

For reasons which follow, we grant the Defendant's Motion for Summary Judgment.

### II. *Factual and Procedural Background*

On July 7, 1989, the Defendant hired the Plaintiff as a machine operator, when the Plaintiff was 45 years old. The Defendant is engaged in the business of manufacturing and leasing railway maintenance equipment, and of providing trained personnel to provide rail maintenance services to railroads. As a machine operator, the Plaintiff was "responsible for operating and maintaining railway equipment in a safe and efficient manner." *Affidavit of Linda Mealey–Lohmann, Exhibit C, Machine Operator Job Description.* In that capacity, the Plaintiff worked on a rail grinding machine, which is a self-propelled train that is equipped with electric grinding motors which are used to grind steel rails

into a proper shape. *Affidavit of Robert Matthews,* at ¶ 6.

On November 30, 1992, the Plaintiff was injured while assisting in the overhaul of a rail grinding machine. As a result of his injury—which occurred when a 4,000 pound piece of machinery fell upon his chest—the Plaintiff was hospitalized for nine days. The accident fractured several ribs, caused some swelling of his brain, and resulted in an undisclosed injury to his right shoulder.[1]

The Plaintiff contends that, during the course of his hospital stay, three of the Defendant's officials visited him, and that one of the three individuals—he cannot recall which one in particular—told him that he should not worry about a job because he was going to have one. *Braziel Deposition* at 70. The Plaintiff has conceded, however, that he does not specifically recall what was said to him with respect to his continued employment. *Id.* at 71.

The Plaintiff returned to work for the Defendant on January 18, 1993. According to his deposition testimony, he was reassured, shortly thereafter, concerning his employment. In this respect, he avers that Ralph Weber ("Weber"), who is the Manager of Safety and Environment in the Defendant's Risk Management Department, discussed his future employment with the Defendant on three occasions. *Id.* at 54. Although, with respect to two of those discussions, the Plaintiff believes that Weber may have been referring to "light duty" positions, he testified that Weber, in a third discussion, informed him that "he would find me something permanently to do." *Id.* at 60–65. The Plaintiff also asserts that James Wood, who was one of the three officials who visited him at the hospital, told him not to worry because he had a job. *Id.* at 73.[2]

---

1. As a result of the accident, the Plaintiff has received workers' compensation benefits, inclusive of $27,000 in medical benefits and in excess of $96,000 in wage replacement benefits. The Plaintiff has also received physical and vocational rehabilitation services, and the services of a qualified rehabilitation specialist. *Affidavit of Ralph Weber,* at ¶ 3. Notably, the Plaintiff is not making any claim in this action against the Defendant, which arises out of the accident, except to the extent that he claims that the Defendant

discriminated against him because of the injuries that were produced by the accident.

2. The Plaintiff has also testified that Theresa Gadach, who is the Defendant's Administrative Services Manager, and Robert Matthews, who is the Defendant's Vice President of Operations, made certain assurances, after his accident, with respect to his employment. The Plaintiff could not recall, however, what either individual had said

Upon his return to work with the Defendant, the Plaintiff was "assigned light duty work because of his injuries." *Complaint* at ¶ 10. The Plaintiff has alleged that, as his condition improved, "he was reassigned to jobs within his physical abilities and medical restrictions." *Id.* at ¶ 11. As related in his deposition testimony, the Plaintiff worked as a field clerk, for approximately one month, in order to relieve a vacationing employee, see *Braziel Deposition* at 46, and he worked as a machine operator for one week. However, rather than work a full shift in the machine operator position, he merely ran the rail grinding machine while the regular operator broke for lunch. *Id.* at 192–194. The Plaintiff also contends that he worked, for approximately two months, in the Defendant's research and development center performing tests on grinding stone. *Id.* at 342. In addition, his deposition testimony reveals that, after the accident, the Plaintiff assembled manuals, in three-ring binders, and delivered parts, by truck, to various locations. *Id.* at 175.

On April 13 and 14, 1993, the Plaintiff underwent a functional capacity evaluation in order to determine his physical capabilities and limitations. Upon evaluation, Mary Beth Purdie ("Purdie"), who is an Occupational Medicine Specialist, concluded that the Plaintiff's physical capabilities did not match the job requirements of the Machine Operator position, as the substance of those requirements had been related to her by the Plaintiff. In July of 1993, Dr. James R. Allen, who was the Plaintiff's treating physician, certified that the Plaintiff had reached Maximum Medical Improvement ("MMI") as of June 3, 1993.[3]

On July 8, 1993, shortly after Weber learned that the Plaintiff had reached MMI, he drafted a Memorandum in which he asked Doug Grant ("Grant"), who is the Defendant's Manager of Human Resources, and Matthews, who was then the Defendant's Director of Operations, whether they were aware of any job positions that would satisfy the Plaintiff's medical restrictions. The Memorandum stated as follows:

> According to Dr. Michienzi, the company physician, Tony Braziel has now reached maximum medical improvement (MMI). The restrictions are outlined on the enclosed form R–33.
>
> The form is pretty detailed, but the most significant restriction is that Tony cannot lift nor carry more than 55 Lbs, with a rarely lift or carry more than 45 to 50 Lbs at any one time.
>
> Based on these restrictions, does either Operations or Human Resources have a permanent position available for Tony within the organization?
>
> If so, please advise. If not, then Tony will need to be released from Loram employment, based on medical reasons and Wausau Insurance will take over payment of wages and determine whether or not training or other vocational type rehabilitation is recommended.

*Affidavit of Linda Mealey–Lohmann, Exhibit J, Memorandum dated July 8, 1993.*

Matthews has testified that, in response to this Memorandum, he contacted Dave Taylor ("Taylor"), who is the Defendant's Manager of Engineering, and George Anderson ("Anderson"), who is a Regional Manager of the Defendant. *Matthews Deposition,* at p. 10. Taylor advised that there were no positions available, and Anderson, who had previously supervised the Plaintiff when he worked as a field clerk, related that the Plaintiff had performed poorly at that position and had to be removed. *Id.* at 10–11.[4] Grant responded to the Memorandum by informing Weber that the Department of Human Resources did not have any openings for a permanent position, nor did he anticipate any openings for the remainder of 1993.

---

to him, if anything, about continued employment. *Braziel Deposition* at 66–67.

**3.** As defined in the Minnesota Workers Compensation Act, the term "maximum medical improvement" means "the date after which no further significant recovery from or significant lasting improvement to a personal injury can reasonably be anticipated, based upon reasonable medical probability." *Minnesota Statutes Section 176.011, Subdivision 25.*

**4.** In contrast, the Plaintiff testified that no one had criticized the manner in which he had performed in the Field Clerk position. *Braziel Deposition* at 45.

*Affidavit of Linda Mealey–Lohmann, Exhibit K, Letter dated July 16, 1993.*

On August 19, 1993, an opening was posted for the position of Operations Clerk. At his deposition, the Plaintiff testified that Weber and Bill Burg ("Burg"), who was the Defendant's Manager of Field Safety, encouraged him to apply for that position. The Plaintiff testified that it was his impression that Weber and Burg wanted him to get the job, and that is why they encouraged him to submit an application. With the assistance of a secretary employed by the Defendant, the Plaintiff submitted his application on August 25, 1993. *Braziel Deposition* at 150. On October 5, 1993, the Plaintiff was notified that the Defendant had decided not to fill that position.

On December 28, 1993, the Defendant terminated the Plaintiff's employment. According to the Plaintiff, he was summoned to Matthews' office, where Weber was waiting, and was told that his service was no longer needed. *Id.* at 349. Matthews then handed the Plaintiff a written termination notice, which provided as follows:

> I have been informed by the Loram Risk Management Department that you have reached maximum medical improvement from your work-related injury.

> Our department, as well as other departments in the company, have been asked to review the possibility of a permanent position which would incorporate the various physical restrictions that have been identified with your condition. After performing a thorough review of positions that might become available, we do not find any suitable positions that would be able to accommodate your physical restrictions that were determined by the physicians.

> Therefore, Loram is severing your employment effective December 28, 1993. We will, however, pay you through January 7, 1994. Hereinafter, it is our understanding that you may be eligible for benefits under Minnesota's Workers Compensation laws.

*Affidavit of Linda Mealey–Lohmann, Exhibit N, Termination Letter dated December 28, 1993.*

The termination letter was signed by Matthews. After reviewing the letter, the Plaintiff testified to the following exchange:

Q: What happened after you read the letter?

A: I asked [Matthews] why I was being terminated.

Q: And then what did he say?

A: He didn't say anything. That's when Ralph Weber spoke up. He said, "We have to take into consideration your age and your disability." I said, "What does my age have to do with it?" I said, "I can work along with the 18–year–olds, younger guys than me, 12 hours a day. I can perform the job just as good as they can." He sat there and didn't say another word. He couldn't give me an answer.

*Braziel Deposition,* at pp. 351–352.

In turn, Weber categorically denies making the alleged statement concerning the Plaintiff's age and disability. *Weber Deposition* at 14.

On August 11, 1994, the Plaintiff filed a Complaint with the Equal Employment Opportunity Commission ("EEOC"), and with the Minnesota Department of Human Rights ("MDHR"), in which he alleged that he was "wrongfully terminated on 12/28/93 because of [his] age and [his] disability." *Affidavit of Linda Mealey–Lohmann, Exhibit L, Original Charge of Discrimination.* Consistent with this assertion, he reported, on an EEOC intake questionnaire, that the earliest discrimination occurred on December 28, 1993, and that the latest discrimination occurred on that same date. *Id., Exhibit K, EEOC Intake Questionnaire.* On January 11, 1996—14 days after the service of the Defendant's Motion for Summary Judgment—the Plaintiff filed an unsigned amended charge of discrimination. The amended charge states that, in addition to being wrongfully terminated for the impermissible reasons of his age and disability, the Plaintiff was also "denied pay raises, performance evaluations, reasonable accommodation, job transfers and positions within my medical restrictions." *Affidavit of John Fabian, Exhibit 4, Amended Charge of Discrimination.*

On or about April 7, 1995, the Plaintiff commenced this action in Minnesota State Court, and the Defendant removed the case to this Court on April 28, 1995. In his

Complaint, the Plaintiff asserts that the Defendant discriminated against him on the basis of a disability, in violation of the Americans with Disabilities Act ("ADA"), *Title 42 U.S.C. § 12131 et seq.*, and the Minnesota Human Rights Act ("MHRA"), *Minnesota Statutes Section 363.01, et seq.*; that the Defendant discriminated against him on the basis of his age, in violation of the Age Discrimination in Employment Act ("ADEA"), *Title 29 U.S.C. § 621 et seq.*, and the MHRA; and that the Defendant breached an alleged contract of employment for life.

Following its filing of an Amended Answer, the Defendant has moved for Summary Judgment as to the entirety of the Plaintiff's Complaint. We have Federal question jurisdiction, under Title 28 U.S.C. § 1331, over the Plaintiff's Federal claims, and supplemental jurisdiction over the State law claims, as allowed by Title 28 U.S.C. § 1441(c).[5]

### III. *Discussion*

A. *Standard of Review.* Summary Judgment is neither an acceptable means of re-

5. As a preliminary matter, we are obliged to determine the scope of the Plaintiff's claims of discrimination. In addition to his claim that he was impermissibly terminated for reasons of his age and disability, the Plaintiff asserts in his Complaint that he was denied positions for which he was qualified, with and without accommodation; that the Defendant failed to provide him with a reasonable accommodation; and that he was discriminated against as to the compensation, terms, upgrading and conditions of his employment. See, *Complaint*, at ¶¶ 19 and 25 (disability), and ¶¶ 35 and 40 (age). Since his original charge related only to his termination, the Defendant argues the Plaintiff's non-discharge claims are time-barred. In turn, the Plaintiff maintains that he successfully amended his charge of discrimination or, alternatively, that the conduct set forth in his Complaint is "like or related" to the substance of his original charge to the EEOC.

Our review discloses that the Plaintiff's only "new" claim is that which relates to the terms and conditions of his employment. To the extent that the Plaintiff has argued that he was denied positions for which he was qualified, with or without accommodation, and that the Defendant failed to provide reasonable accommodation, the arguments merely relate to the central question presented by this case—namely, whether the Defendant intentionally discriminated against him when it terminated his position. In fact, whether the Plaintiff is qualified to perform his former job requirements is an element of his *prima facie* case.

As to his assertion, that he was the victim of discrimination with respect to the terms and conditions of his employment, we agree with the Defendant that this claim is time-barred. The ADEA and the ADA require a plaintiff, as a prerequisite to filing a lawsuit, to file an administrative charge within 300 days of the alleged discriminatory conduct. *Title 42 U.S.C. § 12117(a)* (ADEA, referencing *Title 42 U.S.C. § 2000e–5(e)*); *Title 29 U.S.C. 626(d)* (ADA). Similarly, the MHRA requires a plaintiff to either file an administrative charge, or commence a lawsuit under the MHRA, within one year of the alleged discriminatory conduct. *Minnesota Statutes Section § 363.06, Subdivisions 1 and 3.* Accordingly, the Plaintiff's "terms and conditions"

claim is time-barred unless we find that it was closely interrelated to his original claim of discharge. See, *Anderson v. Block*, 807 F.2d 145, 148 (8th Cir.1986) (untimely administrative filing may be treated as an amendment to earlier charge if new charge "directly related to or grew out of the practices challenged in the prior charge"); *29 C.F.R. § 1601.12(b)*

As noted, it is well-settled that a plaintiff "may raise claims in his lawsuit which 'grow out of' or are 'like or reasonably related' to the administrative charges." *Philipp v. ANR Freight System, Inc.*, 61 F.3d 669, 676 (8th Cir.1995), quoting *Wentz v. Maryland Cas. Co.*, 869 F.2d 1153, 1154 (8th Cir.1989). Otherwise stated, the original charge may be expanded to include "what EEOC investigation could reasonably be expected to grow from the original complaint." *Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 127 (7th Cir.1989); see also, *EEOC v. Delight Wholesale Co.*, 973 F.2d 664, 668 (8th Cir.1992). In support of his contention, that the original and amended claims are "reasonably related," the Plaintiff relies upon *Satz v. ITT Financial Corp.*, 619 F.2d 738, 741 (8th Cir.1980), a case which is factually distinguishable. There, the Court found that the allegations in a plaintiff's Complaint, which involved training opportunities and job assignments, were sufficiently related to her administrative charge that she had been denied equal pay and promotional opportunities. Here, the Plaintiff's new claims allege that he was denied a performance evaluation and a pay raise following his injury. The only similarity between his new claims, and the original charge of a discriminatory discharge, is that all of the claims are premised on allegations of age and disability discrimination. Clearly, the mere similarity as to the type of discrimination is not sufficient to expand the scope of the original charge. See, *Boge v. Ringland–Johnson–Crowley Co.*, 976 F.2d 448, 451 (8th Cir.1992) (the fact that each act was motivated by age discrimination is not enough to expand the scope of the administrative complaint); *Anderson v. Block*, supra (holding that discriminatory suspension is not like or reasonably related to an administrative charge of discriminatory discharge).

Since we conclude that discrimination, as to the terms and conditions of employment, is not

solving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury to weigh the evidence and to render credibility determinations. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). A Summary Judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Rule 56, Federal Rules of Civil Procedure.* For these purposes, a disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a verdict for the non-moving party. See, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986) ("An issue of material fact is genuine if it has a real basis in the record.").

As Rule 56(e) makes clear, once the movant presents a properly supported Motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute. While the Court views the evidence in favor of the nonmoving party and gives that party the benefit of every justifiable inference that may be drawn from that evidence, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but * * * must set forth *specific facts* showing that there is a genuine issue for trial." *Rule 56(e), Federal Rules of Civil Procedure,* [emphasis supplied]; *Krenik v. County of Le Sueur,* 47 F.3d 953, 957 (8th Cir.1995); *State of Nebraska ex rel. Nelson v. Central Interstate Low–Level Radioactive Waste Comm'n.,* 26 F.3d 77, 80 (8th Cir.1994), cert. denied, —— U.S. ——, 115 S.Ct. 483, 130 L.Ed.2d 395 (1994); see also, *Cram v. Lamson & Sessions Co.,* 49 F.3d 466, 471 (8th Cir.1995); *Barnard v. Jackson County, Missouri,* 43 F.3d 1218, 1223 (8th

Cir.1995), cert. denied, —— U.S. ——, 116 S.Ct. 53, 133 L.Ed.2d 17 (1995).

The non-moving party may not rest upon the mere denials or allegations of its pleadings, nor may it simply argue that operative facts will be subsequently developed which will support its claim. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* supra at 586, 106 S.Ct. at 1356 ("[O]pponent must do more than simply show there is some metaphysical doubt as to the material facts."); see, generally, S. Childress, *A New Era for Summary Judgments: Recent Shifts at the Supreme Court,* 116 F.R.D. 183, 188 (1987).

Moreover, a party is entitled to Summary Judgment where its opponent has failed "to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* supra at 322, 106 S.Ct. at 2552. In such a case, no genuine issue of material fact will be found to exist because "a complete failure of proof concerning an essential element of [that party's] case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. at 2552. "In determining whether a material factual dispute exists, the court views the evidence through the prism of the controlling legal standard." *Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 1694, 123 L.Ed.2d 317 (1993). If reasonable minds could differ as to the import of the evidence, however, Summary Judgment should not be granted and, in exercising its function, the Court is not to weigh the evidence. *Anderson v. Liberty Lobby, Inc.,* supra at 250–51, 106 S.Ct. at 2511–12; *AgriStor Leasing v. Farrow,* 826 F.2d 732, 734 (8th Cir.1987).

Lastly, since employment discrimination cases inevitably involve inferences rather than direct evidence, and since intent is frequently the central issue, our Court of Appeals has cautioned that Summary Judgments should "seldom" be used, or at least used "sparingly" in such causes of action. *Davis v. Fleming Companies,* 55 F.3d 1369, 1371 (8th Cir.1995); *Oldham v. West,* 47 F.3d

"reasonably related" to a claim of discriminatory discharge and, therefore, not within the scope of this proceeding, we grant Summary Judgment as

to those claims which involve the terms and conditions of the Plaintiff's employment.

985, 988 (8th Cir.1995); *Hardin v. Hussmann Corp.*, 45 F.3d 262, 264 (8th Cir.1995); *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994); *Gill v. Reorganized School Dist. R–6, Festus, Missouri*, 32 F.3d 376, 378 (8th Cir.1994); *Johnson v. Minnesota Historical Society*, 931 F.2d 1239, 1244 (8th Cir.1991), citing *Haglof v. Northwest Rehabilitation, Inc.*, 910 F.2d 492, 495 (8th Cir.1990). Nevertheless, while "summary judgment should seldom be granted in employment discrimination cases, if [the Plaintiff] fails to establish a factual dispute on each element of the *prima facie* case, summary judgment is appropriate." [6] *Bialas v. Greyhound Lines, Inc.*, 59 F.3d 759, 762 (8th Cir.1995), quoting *Weber v. American Express Co.*, 994 F.2d 513, 515–16 (8th Cir.1993); see also, *Wilson v. International Business Machines*, 62 F.3d 237, 240 (8th Cir.1995).

B. *Legal Analysis.* We conclude that, with respect to each of the claims that the Plaintiff has instituted, the entry of Judgment, as a matter of law, is appropriate, since we find no genuine issue of material fact which would require a Jury's resolution.

1. *The Plaintiff's Discrimination Claims.*

As a threshold matter, we address the proper framework for analyzing employment discrimination, as a general proposition, and then we turn to the specific claims that the Plaintiff has advanced.

An employee, such as the Plaintiff here, who alleges discrimination in the course of his employment, may rely upon either direct or circumstantial evidence to prove his claim. See, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973) (establishing the framework for pretext cases that involve circumstantial evidence); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244–46, 109 S.Ct. 1775, 1787–88, 104 L.Ed.2d 268 (1989) (establishing the framework for mixed-motive cases that involve direct evidence). Although the two analytical models, that are used in the evaluation of direct or circumstantial evidence, originated in the context of Title VII actions, the same constructs have been employed by the Courts in appraising claims under the ADEA and the ADA, as well. See, *Nitschke v. McDonnell Douglas Corp.*, 68 F.3d 249, 251 (8th Cir.1995) (age-discrimination); *Reiff v. Interim Personnel, Inc.*, 906 F.Supp. 1280, 1286 (D.Minn.1995) (disability discrimination).[7]

A mixed-motives analysis is required "when an employment decision was 'the product of a mixture of legitimate and illegitimate motives.' "[8] *Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 448 (8th Cir. 1993), quoting *Price Waterhouse v. Hopkins*, supra. In a mixed motives case, "the plaintiff carries the initial burden of 'showing that

---

6. While not determinative of the issues before us, we would note that the Minnesota Supreme Court has recently reiterated its application of Summary Judgment, in the context of employment discrimination claims, as follows:

 We take this opportunity to express our disapproval of the [Minnesota] court of appeals' sweeping statement that summary judgment is generally inappropriate in discrimination cases. * * * This is not the law of Minnesota. *Dietrich v. Canadian Pacific Ltd.*, 536 N.W.2d 319, 326 n. 9 (Minn.1995).

7. We recognize that the Eighth Circuit has not addressed whether a plaintiff may employ the direct evidence framework in a disability discrimination case, nor has the Plaintiff cited any authority for such a proposition. However, in *Reiff v. Interim Personnel, Inc.*, 906 F.Supp. 1280, 1286 (D.Minn.1995), the Court, while acknowledging the dearth of authority on this issue, concluded that "the *Price Waterhouse* standard should apply to proper claims, based on direct evidence of discrimination, under the

ADA." Nevertheless, the Court there found *Price Waterhouse* inapposite, because the Plaintiff had failed to produce direct evidence of discrimination. *Id.* at 1288. For reasons addressed in the text of this Opinion, we hold that, irrespective of the method of proof on which an ADA plaintiff elects to proceed, he must, as a threshold showing, present sufficient evidence to raise a material issue of fact that he can perform, with or without reasonable accommodation, the essential functions of the job at issue.

8. Under Minnesota employment law, both "single motive" and "mixed motive" claims of disparate treatment are analyzed under the *McDonnell Douglas* test. *Anderson v. Hunter, Keith, Marshall & Co.*, 417 N.W.2d 619, 626–27 (Minn. 1988); *McGrath v. TCF Bank Savings*, 502 N.W.2d 801, 806 (Minn.App.1993), aff'd as modified, 509 N.W.2d 365 (Minn.1993). Since the Minnesota approach would not produce a different result, we only note the distinction and address the issue in the context of the mixed motives precedents of this Circuit.

an illegitimate criterion was a motivating factor in the employer's decision to terminate [his] employment.'" *Philipp v. ANR Freight System, Inc.*, 61 F.3d 669, 673 (8th Cir.1995), quoting *Cram v. Lamson & Sessions Co.*, supra at 471. Once the plaintiff makes this threshold showing, "the burden of persuasion then shifts to the employer to prove that it would have terminated the employee even without the illegitimate criterion." *Id.*

 In making this threshold showing, the plaintiff must present evidence which demonstrates "a specific link between the discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the challenged decision." [9] *Id.*, quoting *Stacks v. Southwestern Bell Yellow Pages, Inc.*, 996 F.2d 200, 201 n. 1 (8th Cir.1993). "This requirement of a causal link between discriminatory statements and the decisional process therefore renders insufficient 'stray remarks in the workplace,' 'statements by non-decisionmakers,' or 'statements by decisionmakers unrelated to the decisional process itself.'" *Id.*, quoting *Beshears v. Asbill*, 930 F.2d 1348, 1354 (8th Cir.1991), in turn quoting *Price Waterhouse v. Hopkins*, supra at 277, 109 S.Ct. at 1804 (O'Connor, J., concurring). Thus, "actions and comments by employees not involved in a discharge decision cannot provide a basis for charging other employees with discrimination." *Hermeling v. Montgomery Ward & Co., Inc.*, 851 F.Supp. 1369, 1378 (D.Minn.1994), quoting *Price Waterhouse v. Hopkins*, supra.

 In contrast, the premise of a pretext case "is that *either* a legitimate or illegitimate set of considerations led to the challenged decision." *Radabaugh v. Zip Feed Mills, Inc.*, supra at 448 [emphasis in original], quoting *Price Waterhouse v. Hopkins*, supra at 247, 109 S.Ct. at 1789. Under the *McDonnell Douglas* framework, "the plaintiff creates an inference of intentional discrimination by establishing the so-called *prima facie* case." *Hutson v. McDonnell Douglas*, 63 F.3d 771, 776 (8th Cir.1995). "While its elements will vary depending on the circumstances of the case, the fundamental purpose of the *prima facie* case is to require the plaintiff to show: (1) that an adverse employment action occurred, and (2) that the most common explanations for an adverse employment action, such as incompetence, are not applicable." *Id.* Generally, in presenting a *prima facie* case of discrimination, the plaintiff must demonstrate that he is a member of a protected class, that he meets the minimum qualifications for the position at issue, and that he suffered some form of adverse employment decision.

 Once the Plaintiff has made that *prima facie* showing, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for its challenged decision. *McDonnell Douglas Corp. v. Green*, supra at 802, 93 S.Ct. at 1824; *Texas Department of Comm. Affairs v. Burdine*, 450 U.S. 248, 254–55, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981); *Hutson v. McDonnell Douglas Corp.*, supra ("Once established, the *prima facie* case entitles the plaintiff to a rebuttable presumption that intentional discrimination played a role in the adverse employment action."). If the Defendant provides such a reason, then "the burden shifts back to the plaintiff to demonstrate that the reason provided was a pretext for discrimination." *Id.* at 777. However, should the employer be unable to provide such a reason for its decision, then the employee is entitled to a finding of intentional discrimination. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510 n. 3, 113 S.Ct. 2742, 2748 n. 3, 125

---

9. Ordinarily, a mixed motives analysis is implicated where the employee presents "direct evidence" of unlawful discrimination. *Beshears v. Asbill*, 930 F.2d 1348, 1354 (8th Cir.1991). Although denominated "direct evidence," in *Stacks v. Southwestern Bell Yellow Pages, Inc.*, 996 F.2d 200, 201 n. 1 (8th Cir.1993), our Court of Appeals observed that, in a strict hornbook sense, the evidence necessary to shift the burden of persuasion under the *Price Waterhouse* doctrine requires an inferential step from the statement itself to the conclusion that a discriminatory motive played a role in the pertinent employment decision. Thus, the use of the term "direct evidence" may be more properly classified as evidence that is, in practical effect, circumstantial in nature. *Reiff v. Interim Personnel, Inc.*, supra at 1288 n. 3, citing *Stacks v. Southwestern Bell Yellow Pages, Inc.*, supra.

L.Ed.2d 407 (1993). Under this burden-shifting approach, the plaintiff retains the ultimate burden of persuasion that the employer's proffered reason is pretextual and that the plaintiff has, in fact, been a victim of intentional discrimination. *Id.* at 506–12, 113 S.Ct. at 2746–50.

Here, the Plaintiff asserts that he has both direct and circumstantial evidence of discrimination and, therefore, we will examine his claims under either the mixed-motive or the pretext framework, as appropriate.[10] Moreover, since the elements of a plaintiff's *prima facie* case will necessarily vary with the type of discrimination being alleged, we will separately set forth the respective *prima facie* showings under the his ADA and ADEA claims.

a. *The Plaintiff's Disability Discrimination Claims.* In Counts One and Two of his Complaint, the Plaintiff asserts that he was discharged by the Defendant because of a disability which the Defendant failed to accommodate.

1) *Standard of Review.* The ADA prohibits employers from discriminating "against a qualified individual with a disability because of the disability of such individual." *Title 42 U.S.C. § 12112(a).* The ADA defines "qualified individual with a disability"·as follows:

> The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.

*Title 42 U.S.C. § 12111(8).*

Our Court of Appeals has articulated a two-part test for determining whether a person is "qualified" within the meaning of the ADA: first, "whether the individual meets the necessary prerequisites for the job, such as education, experience, training, and the like," and second, "whether the individual can perform the essential job functions, with or without reasonable accommodation." *Benson v. Northwest Airlines, Inc.,* 62 F.3d 1108, 1112 (8th Cir.1995).

■ Accordingly, "[t]o establish a *prima facie* case under the ADA, a plaintiff must show that [he] is a disabled person within the meaning of the ADA, that [he] is qualified to perform the essential functions of the job (either with or without reasonable accommodation), and that [he] has suffered an adverse employment action under circumstances from which an inference of unlawful discrimination arises." *Price v. S–B Power Tool,* 75 F.3d 362, 365 (8th Cir.1996), citing *Benson v. Northwest Airlines, Inc.,* supra at 1112. In this context, "[a]n inference of discrimination may be raised by evidence that a plaintiff was replaced by or treated less favorably than similarly situated employees who are not in the plaintiff's protected class." *Id.*

2) *Legal Analysis.* Given these precepts, we conclude that the Plaintiff has failed to present a material issue of fact that he is a "qualified individual with a disability," as that term is defined in the ADA and, therefore, we grant Summary Judgment to the Defendant on the Plaintiff's disability-based discrimination claims.

■ Normally, when the employee, as here, alleges both direct and circumstantial evidence of discrimination, the Court begins its analysis with the direct evidence.[11] Thus,

---

10. Notwithstanding the distinctions between the governing Minnesota and Federal laws that we have noted and that, in our judgment, are not determinative, we have adopted the approach employed by the parties of examining the State and Federal claims under the pertinent Federal standards. See, *Reiff v. Interim Personnel, Inc.,* supra at 1292 (claims brought under the ADA and the MHRA are assessed under the same Federal standards); *Hermeling v. Montgomery Ward & Co., Inc.,* 851 F.Supp. 1369, 1376 n. 6 (D.Minn.1994) (noting that Minnesota Courts have interpreted discrimination cases under Federal standards, the Court applied Federal standards to age discrimination action brought under the MHRA). The sole exception relates to the issue of whether the Minnesota Workers' Compensation Act preempts disability claims under the Minnesota Human Rights Act ("MHRA"). See, infra, n. 20.

11. In this respect, our Court of Appeals, in *Stacks v. Southwestern Bell Yellow Pages, Inc.,* supra at 202, observed that *"Price Waterhouse* requires the district court to make an explicit finding whether the case is or is not a 'mixed motives' case." Here, the following discussion, as taken from the Plaintiff's Opposition Memorandum, suggests that he seeks to primarily proceed under the mixed motives paradigm:

> The Defendant's analysis of Plaintiff's claims within the framework of McDonnell Douglas is

"[i]f the plaintiff has failed to satisfy the Price Waterhouse threshold, the case should be decided under the principles announced in *McDonnell Douglas*[.]" *Radabaugh v. Zip Feed Mills, Inc.,* supra at 448 (citations omitted). As recently expressed by our Court of Appeals, "[a]fter all, the *McDonnell Douglas* framework exists to provide discrimination plaintiffs a way to prove their case when they do not have 'explicit, inculpatory evidence of discriminatory intent[;]' [i]f a plaintiff *does* have such evidence, burden-shifting analysis is unnecessary." *Shannon v. Ford Motor Co.,* 72 F.3d 678, 682 (8th Cir.1996) [emphasis in original], quoting *Hutson v. McDonnell Douglas,* supra at 776. Thus, in an ADEA case, where a plaintiff has "direct evidence" of age discrimination, he does not necessarily "lose" because he cannot establish "the second element of the *McDonnell Douglas* test, i.e., that [he] performed the job at a level that met [his] employer's expectations." *Perry v. Kunz,* 878 F.2d 1056, 1060 (8th Cir.1989). Since the governing provision of the ADEA merely makes it unlawful for an employer to "discharge an individual * * * because of such individual's age," the Court in *Perry* concluded that an ADEA plaintiff should not be required to prove the second element of his *prima facie* case if there were direct evidence of discrimination. *Id.* at 1061, quoting *Title 29 U.S.C. § 623(a)(1);* see also, *Fox v. Southwestern Bell Telephone Co.,* 839 F.Supp. 678, 679 (E.D.Mo.1993) (holding that a plaintiff, in a Title VII case, "need not demonstrate the second element if he provides direct evidence of intentional discrimination").

■ In contrast, in an ADA claim for job termination, the second element of a plaintiff's *prima facie* case—namely, whether he is qualified to perform the essential functions of the job (either with or without reasonable accommodation)—is, by the express terms of the statute, a statutory precondition to relief. See, *Title 42 U.S.C. 12111(8).* Unlike claims of race, age, or gender discrimination, which require only that an individual suffer an ad-

verse employment decision because of the improper criterion, the protections encompassed by the ADA are limited to "qualified individual[s] with a disability." Compare *Title 42 U.S.C. § 12112(a)* with *Title 29 U.S.C. § 623(a)* and *Title 42 U.S.C. § 2000e–2(a).* Thus, in order to withstand summary disposition, an ADA plaintiff must present sufficient evidence to raise a genuine issue of material fact concerning his status as "a qualified individual with a disability." As to this specific issue, we conclude that the Record before us, when viewed in a light most favorable to the Plaintiff, discloses that the Defendant had no available jobs that were compatible with the Plaintiff's medical restrictions.

■ To avert such a conclusion, the Plaintiff has relied upon *Benson v. Northwest Airlines, Inc.,* supra at 1114, as his basis to argue that, for purposes of ascertaining his ability to perform a position's "essential functions," we should focus upon the position that he held at the time of his discharge, rather than his permanent position. We think, however, that his reliance upon *Benson* is misplaced. In *Benson,* the plaintiff was injured in a work-related accident, which resulted in his physician's opinion that he would not be able to perform his previous job as a mechanic. *Id.* at 1110. Based upon the physician's prognosis, the plaintiff was transferred to a Department in which employees, who were impaired by work-related injuries, would hold formally established and recognized jobs until they could return to their former positions. The plaintiff was then "bumped" from such a position by a more senior employee, and he assumed the position of a plant maintenance mechanic. *Id.* Four days later, the defendant disqualified the plaintiff from that position "due to the medical limitations established by [his] physician." *Id.* The plaintiff was placed on unpaid leave and, after unsuccessfully seeking a transfer to "at least three vacant positions," he was terminated. *Id.* at 1114.

■ Here, unlike the circumstances in *Benson,* the Plaintiff was not discharged be-

---

incorrect. Plaintiff has presented direct evidence of Loram's age and disability motivated discriminatory animus.
*Braziel's Memorandum in Opposition,* at p. 12.

Later, however, he argues in the alternative by asserting that, if direct evidence of discrimination is not found, then the Defendant's Motion should be denied under the approach set forth in *McDonnell Douglas. Id.* at pp. 15–22.

cause the Defendant had determined that he could not physically perform the duties that were assigned to him immediately preceding his termination.[12] We conclude that when, as here, a plaintiff is discharged from temporary, light-duty assignments,[13] for reasons other than the employer's belief that the employee was not physically capable of performing that work, it would be illogical to focus upon the capacity of the employee to perform the essential functions of the temporary job assignment that he held just prior to his termination.[14]

At the time of his injury, the Plaintiff was employed as a machine operator. The job description for that position required the "operator to endure heavy physical exertion." *Affidavit of Linda Mealey–Lohmann, Exhibit C, Machine Operator Job Description.* According to that same job description, the position required "work[ing] an average of 12 hour days and an average of 6 days per week[,] * * * lifting, the use of hand tools, grasping, repetitive wrist action, arm-hand steadiness[,] eye-hand coordination [and] considerable balancing." *Id.* At his deposition, the Plaintiff testified that all of these physically exertional duties were essential functions of that job.[15]

Moreover, during the course of his functional capacity evaluation, the Plaintiff de-

---

12. At the time of his termination, the Plaintiff's job involved placing materials in three-ring binders. *Braziel Deposition,* at p. 400. He had been working at this job for the preceding three or four days and, before that, he had been driving parts to field locations on an "as needed" basis. *Id.* at 401. There is no suggestion in this Record that the Plaintiff was discharged because the Defendant believed that he was not physically capable of performing the responsibilities of these light duty assignments.

13. The Plaintiff admitted at his deposition that he wasn't permanently reassigned to the home office and that, although he considered it a "job," his duties required him to fill-in where help was needed. *Braziel Deposition,* at p. 174.

14. In *Benson v. Northwest Airlines, Inc.,* 62 F.3d 1108 (8th Cir.1995), the plaintiff was assigned to a formally established and recognized job position—albeit one involving light-duty work. The established nature of that job slot was confirmed by the fact that the plaintiff was "bumped" from that position by a co-worker who had superior seniority rights. The plaintiff then exercised his seniority rights to hold a different mechanic's position from that he held at the time that he had been injured. Accordingly, on the basis of the Record before it, our Court of Appeals refused to assume that the job requirements of all mechanic job positions were identical. Of course, here, there is no legitimate basis to contend that the Plaintiff held any permanent job position during the time that the Defendant surveyed its job classifications for one that the Plaintiff might be capable of performing. We think that distinction makes a legal difference.

If, as the Plaintiff appears to urge, an employer will be obligated to maintain the employment of disabled employees who have been given temporary, light-duty assignments, during a period of recuperation, then a disincentive to offer such beneficial employment opportunities will follow. Any such holding would bring added meaning to Gore Vidal's observation that "a good deed never goes unpunished." More importantly, such a holding is, in our view, precluded by the decision in *Benson,* itself. There, the Court took pains to explain that the "ADA does not require that [the employer] take action inconsistent with the contractual rights of other workers under a collective bargaining agreement, * * * nor does it require that [the employer] create a new position." *Id.* at 1114. The Court continued by noting a gap in the evidence as to whether a potential vacancy, that may have been available to the plaintiff, was "really a position" and, being unable to resolve the matter on the basis of the undeveloped Record before it, the Court concluded that a "material fact issue remain[ed]." *Id.* at 1115. The same may not be said here, as all concede that the temporary assignments that the Plaintiff transiently held, were make-shift in content and were not recognized, permanent job classifications.

15. At the Hearing, the Plaintiff argued that his testimony, as to the essential functions of the machine operator position, should not be accorded any weight since it expresses a legal conclusion. We disagree. It is well established that a witness may testify to the knowledge that he gained from industry experience. See, *Burlington Northern R. Co. v. State of Neb.,* 802 F.2d 994, 1004–05 (8th Cir.1986) (perceptions based upon industry experience is a sufficient foundation for lay opinion testimony), citing *Farner v. Paccar, Inc.,* 562 F.2d 518, 520 (8th Cir.1977); see also, *Hartzell Mfg. v. American Chemical Technologies,* 899 F.Supp. 405, 408–410 (D.Minn.1995).

Indeed, as here pertinent, the Regulations implementing the ADA define "essential functions" as "those functions that the individual who holds the position must be able to perform unaided or with the assistance of a reasonable accommodation." 29 C.F.R. Pt. 1630, App. § 1630.2(n); see also, *White v. York Intern. Corp.,* 45 F.3d 357, 361 (10th Cir.1995) (defining essential functions as those that bear "more than a marginal relationship to the job at issue"). Given the Plaintiff's

scribed the Machine Operator position as requiring "very heavy lifting, frequent overhead work, walking on uneven ground, [and] frequent bending and twisting[.]" *Id., Exhibit D, Functional Capacity Profile.* Based upon the Plaintiff's description, and an independent evaluation of his physical abilities, an Occupational Medicine Specialist concluded that he could no longer perform that job. Similarly, Dr. Allen, who was the Plaintiff's physician, also determined that the Plaintiff would not be able to resume his former employment. As reflected in the following exchange, the Plaintiff concurred with Dr. Allen's assessment:

> A: After my injury I talked to Dr. Allen and Dr. Michienzi. They both advised me that by going back to doing what I was doing I wouldn't be able to do it.
>
> Q: Do you agree or disagree with that advice.
>
> A: I would have to agree with it.
>
> Q: So you don't believe you are able to perform the machine operator duties, is that true?
>
> A: Probably couldn't do it the same as I did before I got injured. In fact, I know I couldn't do it on my restrictions. I would be unable to do it.

*Braziel Deposition,* at p. 263.

In view of the Record before us, inclusive of the opinions of the Plaintiff, his treating physician, and an independent rehabilitation expert, together with the pertinent written job description, we conclude that the Plaintiff was unable to perform the essential functions of the Machine Operator position. See, *Title 42 U.S.C. § 12111(8)* (employer's written job description shall be considered evidence of essential functions of the job). Notwithstanding this conclusion, we are obliged to consider whether the Plaintiff has created a genuine issue of fact concerning his ability to perform the essential functions of that position, but with the assist of reasonable accom-

modation. As set forth in the ADA, the term "reasonable accommodation" may include job restructuring or reassignment to a vacant position. *Title 42 U.S.C. § 12111(9).*

 As to possible job restructuring, the Plaintiff admitted that he never proposed any modifications that would have enabled him to perform the Machine Operator position. *Braziel Deposition,* at p. 332. However, under the ADA, the employee must specifically request the particular accommodation that he seeks. *Lue v. Moore,* 43 F.3d 1203, 1206 (8th Cir.1994) (holding that the Rehabilitation Act did not require the Defendant to accommodate the Plaintiff because the Plaintiff never requested an accommodation),[16] citing *Wood v. President & Trustees of Spring Hill College,* 978 F.2d 1214, 1222 (11th Cir.1992) (whether the employer provided reasonable accommodations was not an issue because the Plaintiff never requested accommodations). As a District Court within this Circuit recently observed, an "employee can't expect the employer to read his mind and know he secretly wanted a particular accommodation and sue the employer for not providing it." *Ferry v. Roosevelt Bank,* 883 F.Supp. 435, 441 (E.D.Mo.1995), quoting *Schmidt v. Safeway, Inc.,* 864 F.Supp. 991, 997 (D.Or.1994).

In addition, at the time of his deposition, the Plaintiff could not identify how the Machine Operator position could be modified so as to enable him to perform its essential functions. *Braziel Deposition,* at p. 91. Indeed, the only evidence that the Plaintiff offers, as to a possible accommodation, is a reference to a letter from the Defendant to Plaintiff's counsel which addresses a job offer that had been submitted to the Plaintiff approximately one year after his termination. *Braziel's Memorandum in Opposition,* at p. 18 n. 10. As the letter makes clear, the offered position appears to have included several of the duties that were involved in his

---

first-hand work experience as a machine operator, for a period of over three years, we conclude that he held a sufficient factual foundation upon which to form and express an opinion as to that position's essential functions.

**16.** Because the ADA expressly requires that its provisions be interpreted in a manner that "pre-

vents imposition of inconsistent or conflicting standards for the same requirements under the ADA and the Rehabilitation Act of 1973," *Title 42 U.S.C. § 12117(b),* cases interpreting the Rehabilitation Act are relevant to our analysis. *Benson v. Northwest Airlines,* supra at 1112 n. 2.

former Machine Operator position but, among other modifications, the Defendant was prepared to eliminate the "groundman and maintenance and repairwork functions from this position." *Affidavit of John Fabian, Exhibit 7, Letter dated January 18, 1995.* The letter also implies that the Plaintiff refused the position, in part, because of his physician's "impression that, under ideal circumstances, [the Plaintiff] could perhaps handle the job but that it would be very likely the ideal circumstances could not be reached due to peer pressure and the fact that he would likely get into activities which would worsen his neck and back condition." *Id.* In effect, rather than to strengthen the Plaintiff's argument, the letter reveals a legitimate attempt by the Defendant to accommodate his disability through the removal of several functions that were detailed in the applicable job description. Absent any other showing, as to how the Machine Operator position could be modified so as to accommodate his medical restrictions, we conclude that the Plaintiff has failed to present a "facial showing" that he could perform the essential functions of that position even with reasonable accommodation.

With respect to a possible accommodation, by means of a reassignment to another position, at his deposition, the Plaintiff did refer to the positions of Operations Clerk, Research and Lab Technician, Field Clerk and Truck Driver as sources of a reassignment. *Braziel Deposition,* at p. 331. "[O]nce the plaintiff makes 'a facial showing that reasonable accommodation is possible,' the burden of production shifts to the employer to show that it is unable to accommodate the employee." *Benson v. Northwest Airlines,* supra at 1112, quoting *Mason v. Frank,* 32 F.3d 315, 318–19 (8th Cir.1994). Thereafter, "[i]f the employer shows that the employee cannot perform the essential functions of the job even with reasonable accommodation, the employee must rebut that showing with evidence of his individual capabilities." *Id.* Here, even if the Plaintiff's reference to the other positions were sufficient to make a "facial showing," we conclude that the Defendant has presented uncontroverted evidence that there was no available,

vacant job position that the Plaintiff could perform.

Under the ADA, reasonable accommodation does not require an employer to create a new permanent position. See, *Benson v. Northwest Airlines,* supra at 1114. Nor is an employer required to convert a temporary, light-duty job into a permanent position. See, *EEOC Technical Assistance Manual on the ADA,* at § 9.4 ("If the position was created as a temporary job, a reassignment to that position need only be for a temporary period."). We conclude that, given these abiding principles, the Defendant was not required to retain the Plaintiff as a "Truck Driver," as the Defendant had no such permanent position, in its roster of jobs, that entailed only those responsibilities. In fact, the Plaintiff has testified that, at most, he delivered parts on a three-quarter-time basis. *Braziel Deposition,* at p. 248. Moreover, the Plaintiff admitted that those individuals who, like himself, delivered parts to the field on an "as needed" basis, either had injuries from which they were recuperating, or they delivered parts as an aspect of their regular job duties. *Id.* at 426–252.

As to the other positions that the Plaintiff has identified, he admits that he only applied for the Operations Clerk position. *Braziel Deposition,* at pp. 160, 354–55. In *Chambers v. Wynne School Dist.,* 909 F.2d 1214, 1217 (8th Cir.1990), our Court of Appeals determined that an employee's failure to formally apply for a position barred her from establishing a *prima facie* case of gender and race discrimination. Although "plaintiffs need not prove they formally applied for a position if they allege facts which, if proven, would be sufficient to establish that application was futile due to defendants' discriminatory practices," *Winbush v. State by Glenwood State Hospital,* 66 F.3d 1471, 1481 (8th Cir.1995), the Plaintiff testified that he had no basis to believe that the Defendant discriminated with respect to these applications. *Braziel Deposition,* at p. 160.

A second exception to the job application rule exists where "the plaintiff made every reasonable attempt to convey his interest in the job to the employer." *Chambers v.*

*Wynne School Dist.*, supra, quoting *Equal Employment Opportunity Comm'n. v. Metal Service Co.*, 892 F.2d 341, 348 (3d Cir.1990). While, at one point, the Plaintiff testified that, except for the Operations Clerk position, he could not recall advising any representative of the Defendant, during 1993, that he wanted to work in a certain job position, he later testified that he expressed an interest in a Field Clerk position to two of the Defendant's superintendents. *Braziel Deposition*, at pp. 354–62. However, the Field Clerk position was held, after a temporary absence, by the same individual who had previously occupied it. According to the Plaintiff, the individual returned to that position despite having previously notified the Defendant of an intent to quit. *Id.* at p. 359. Notably, the Plaintiff has presented no evidence that the Defendant considered the Field Clerk position to be vacant, or that the Defendant solicited applications for that position.

■ At the Hearing, the Plaintiff argued that he should be excused from any job application requirement because employees of the Defendant had informed him, both during his hospital stay and shortly after his return to work, that he would have a job with the Defendant. While the argument has some superficial appeal, we reject its application here for, to accept the argument, would place an employer in the position of having to inventory all positions, within its organization, and then attempt to ascertain those positions that the plaintiff could physically perform. Indeed, the principle underlying those decisions, in which the Courts have required an ADA plaintiff to expressly request the accommodation he seeks, is that the employee is in the best position to know what jobs he can physically accomplish.[17]

■ Even if we overlooked the Plaintiff's failure to apply for a Research Lab or a Field Clerk position, the Plaintiff has presented no evidence that any such a position was available at any time after his accident and before his termination. In this respect, the law is clear that, as a reasonable accommodation, an employer need only assign an employee, to a vacant position—the employer is not obligated to create a vacancy. *Title 42 U.S.C. § 12111(9)(B).* With regard to the Research Lab position, however, the Plaintiff argues that, notwithstanding the absence of any vacancy at the time of his termination, he believed that another individual, who held a similar position, would be approaching retirement. *Braziel Deposition,* at p. 135. Based upon this self-held belief, he contends that the Defendant should have continued his employment until that individual retired in order to award him that job.[18] Of course, an ADA claimant can almost always argue that his employer should have continued his light-duty employment until a suitable position opened, but we need not resolve that issue in this instance, because the Plaintiff acknowledged that he did not know when the suspected retirement occurred, if at all, nor did

---

17. In addition, the Plaintiff has testified to his understanding that, to be considered for a transfer to a different position in the company, he would have to apply for that job. *Id.* at p. 159; see also, *Lyoch v. Anheuser–Busch Companies, Inc.*, 164 F.R.D. 62, 67 (E.D.Mo.1995) (the employee may be excused from submitting a job application where the employer had no formal application process). As to the Defendant's job application practice, the uncontradicted Affidavit of Grant, who is the manager of the Defendant's Human Resources Department, avers as follows:

Loram has a policy which applies to all salaried and hourly employees regarding transfers. This policy gives each employee the responsibility and right to apply for open positions. Employees do not need approval from anyone to apply for an open position. All available open positions are posted on a bulletin board that is easily accessible to employees. This policy was in effect during Anthony Braziel's employment. Job Bulletins also are electronically transmitted via e-mail bulletin. A copy of the Job Bulletins also are sent to each machine in the field so that all employees in the field have access to the job postings.
*Affidavit of Grant*, at ¶ 6.

18. We note that the Plaintiff did not cite any published authority for this proposition, and we are not persuaded that the ADA requires make-work assignments of a disabled worker in order to bridge a period of unemployment caused by the absence of any job vacancies that he would be capable of performing. Cf., *Wooten v. Farmland Foods*, 58 F.3d 382, 386 (8th Cir.1995) ("[The Plaintiff's] evidence that he applied but was not chosen for a job that would have accommodated his limitations is not material because the job became available only after he was terminated.").

he know whether the suspected vacancy was ever filled. *Id.*

■ Lastly, with respect to the Operations Clerk position, the Plaintiff has made no showing that the job was ever filled. In fact, on October 5, 1993, the Defendant notified the Plaintiff that it had decided not to fill that position, as the Defendant determined that the position was unnecessary and, to this date, the position has never been occupied. *Affidavit of Grant*, at ¶ 7. The Plaintiff has conceded that he was unaware of the status of that position and, further, he did not have a basis to dispute the Defendant's decision to discontinue that particular job. *Braziel Deposition*, at pp. 167–68, and 358.[19] Accordingly, as to the Operations Clerk position, the Plaintiff has failed to raise a genuine issue of material fact concerning the need for the Defendant to reasonably accommodate his disability.

■ Of course, mere speculation about possible positions is not sufficient to defeat a Motion for Summary Judgment. See, *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1125 (10th Cir.1995). Here, the Plaintiff has conceded that his disbelief of the Defendant's representation, to the effect that there was "no permanent work available within restric-

tions," was based on speculation. *Braziel Deposition*, at p. 265–266. While the Plaintiff is entitled to the benefit of all reasonable inferences, "an inference is reasonable only if it can be drawn from the evidence without resort to speculation." *Frieze v. Boatmen's Bank of Belton*, 950 F.2d 538, 541 (8th Cir. 1991). Accordingly, we conclude that the Record reveals no disputed material fact, concerning the Plaintiff's physical qualifications, with or without reasonable accommodation, to perform the essential functions of an available position with the Defendant and, because the Plaintiff was not a "qualified individual with a disability," he is not entitled to statutory protection, and we need not address his proffered "direct evidence" of discriminatory animus.[20]

b. *The Plaintiff's Age Discrimination Claims.* In Counts Four and Five of his Complaint, the Plaintiff maintains that his termination was the product of impermissible age discrimination.

1) *Standard of Review.* Until recently, a plaintiff established a *prima facie* case of age discrimination by showing that: "(1) he was within the protected age group; (2) he met applicable job qualifications; (3) he was discharged; and (4) after his termination, the

---

**19.** Although, at a different point in his deposition, the Plaintiff testified that the Operations Clerk position had been filled by Pat Gallagher ("Gallagher"), he later conceded that Gallagher, who is a manager with the Defendant, not only was several levels above him in the organization, but that he held a different position, the responsibilities of which only partly included the duties that would be entailed in the Operations Clerk's job description. The Plaintiff also admitted that he did not know whether he would be qualified for Gallagher's job, because he did know what that job entailed. *Braziel Deposition*, at pp. 137 and 170.

**20.** Even if we found that Braziel had raised a genuine issue of fact concerning his status as a "qualified individual with a disability," we would deny Count Two of his Complaint, which is premised on the protections afforded by the MHRA, because Braziel accepted Minnesota workers' compensation benefits. Pursuant to Minnesota Statutes Section § 176.031, "[t]he liability of an employer, that is prescribed by [the Minnesota Worker's Compensation Act ("WCA")] is exclusive."

In *Karst v. F.C. Hayer Co. Inc.*, 447 N.W.2d 180 (Minn.1989), the Minnesota Supreme Court held

that the WCA's exclusive remedy provision precluded an action for disability discrimination under the MHRA. In *Karst*, the Court reasoned that the WCA addressed disability discrimination because an injured employee who was not provided with post-injury employment received greater benefits than a similarly situated employee whose employer had offered continued employment. The Court observed that the plaintiff was "not without a remedy," and that any difference between his "discrimination" injuries, and his "work-related" injuries, was "immaterial". *Id.* at 186, 184. We conclude that the decision in *Karst* controls the outcome of his disability claim under the MHRA. In arguing that his State law disability claim is not barred by the WCA, the Plaintiff solely relies upon *Hunter v. Nash Finch Co.*, 498 N.W.2d 759 (Minn.App.1993), a case we find to be inapposite. There, "unlike the employee in *Karst*, the disability upon which [the plaintiff's] claim [was] based resulted from a workplace injury at a previous employer." *Id.*, at 762. Here, as in *Karst*, the Plaintiff's disability, upon which he has premised his discrimination claim, resulted from the same injury for which he has received workers' compensation benefits.

position remained open or the employer hired a person not in the protected class." *Bialas v. Greyhound Lines, Inc.*, 59 F.3d 759, 763 (8th Cir.1995); see also, *Allen v. Bridgestone/Firestone, Inc.*, 81 F.3d 793, 796 (8th Cir.1996). However, in *O'Connor v. Consolidated Coin Caterers Corp.*, —— U.S. ——, ——, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996), the Supreme Court held that "[b]ecause it lacks probative value, the fact that an ADEA plaintiff was replaced by someone outside the protected class is not a proper element of the *McDonnell Douglas prima facie* case." In the Court's view, the required inference " 'that an employment decision was based on a[n] [illegal] discriminatory criterion[,]' " cannot reasonably be "drawn from the replacement of one worker with another worker insignificantly younger." *Id.*, [citation omitted]. Instead, "the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class." *Id.*; accord, *Rinehart v. City of Independence, Mo.*, 35 F.3d 1263, 1269 (8th Cir.1994) (in *dicta*, the Court opined that a plaintiff may establish the fourth element of his *prima facie* case by showing that he was replaced by a person sufficiently younger to permit an inference of age discrimination), cert. denied, —— U.S. ——, 115 S.Ct. 1822, 131 L.Ed.2d 744 (1995).

*2) Legal Analysis.* Given this framework for our analysis, we conclude that the Plaintiff has failed to present sufficient evidence to raise a genuine issue of material fact as to whether the Defendant discharged the Plaintiff on the basis of his age.

 First, we examine the Plaintiff's asserted "direct evidence" of age discrimination in order to determine the applicability of the test enunciated in *Price Waterhouse*. For "direct evidence," the Plaintiff has relied upon two separate statements by Weber. In a conversation relating to the Operations Clerk position, Weber is alleged to have informed the Plaintiff that "[w]e're going to

have to look at your age and your disabilities." *Braziel Deposition*, at p. 144. According to the Plaintiff, Weber repeated a variation of that same statement at the time that he was handed his termination letter, when Weber is purported to have responded to the Plaintiff's question, concerning the basis for his discharge, by stating that "[w]e have to take into consideration your age and your disability." *Id.* at 351–52.[21]

In turn, the Defendant asserts that Weber's comments were, at best, "stray comments" and, therefore, insufficient under the *Price Waterhouse* threshold. Of course, "[n]ot all comments that reflect a discriminatory attitude will support an inference that an illegitimate criterion was a motivating factor in an employment decision." *Hermeling v. Montgomery Ward & Co., Inc.*, supra at 1369 [citation omitted]. Therefore, the issue presented is whether Weber was sufficiently involved in the Defendant's decision to terminate the Plaintiff so as to constitute direct evidence of a discriminatory intent. We conclude that he was not and, accordingly, the Plaintiff has not satisfied the threshold showing required for "mixed motives" treatment.

In support of his contention, that Weber was involved in the termination decision, the Plaintiff points to the Memorandum that had been drafted by Weber, approximately six months prior to the Plaintiff's termination, in which Weber set forth the Plaintiff's medical restrictions, as they had been related by the Plaintiff's physician, and requested the Manager of Human Resources, together with the Director of Operations, to advise of their awareness of any available permanent positions which were compatible with the Plaintiff's medical restrictions. Although Weber expressed the view in the Memorandum that, in the event there are no positions available, the Plaintiff "will need to be released from Loram employment, based on medical reasons," the Memorandum does not show Weber's actual involvement in the termination decision. Rather, the Memorandum shows

---

**21.** Although Weber denies making any statement about the Plaintiff's age or disability, we assume—as we must—that the Plaintiff's description of the statements is entirely accurate. We expressly make clear, however, that our role in

considering Summary Judgment Motions is not to resolve factual disputes and, accordingly, we leave undecided whether the rendition of the facts by one party or the other is the more believable.

no more than that Weber forthrightly sought to explore any positions, within the Defendant's organization, that might be appropriate for the Plaintiff's assignment.

Next, the Plaintiff focuses upon Matthews' deposition testimony as evidencing Weber's involvement in the decision to terminate him.[22] Specifically, the Plaintiff highlights Matthews' characterization of Weber as the "point man," and his testimony that he spoke to Weber before he decided to terminate the Plaintiff. *Matthews Deposition*, at pp. 15, 32–34. Read in context, however, it is clear that Matthews regarded Weber as the "gatekeeper," not as to termination decisions, but as to "comp situations." *Id.* at 15. Moreover, a fair reading of Matthews' testimony reveals that his discussion with Weber, prior to the Plaintiff's discharge, was limited to his inquiry concerning the Defendant's obligation, if any, to create a position for the Plaintiff irrespective of a need for the position. *Id.* at 34. According to Matthews, Weber responded that the Defendant had no such obligation. *Id.*

Lastly, the Plaintiff argues that Weber's presence in Matthews' office, at the time he was discharged, reflects Weber's involvement in the termination decision. While conceding that Weber was, indeed, in Matthews' office, the Defendant maintains that he was present simply as a witness to what transpired. *Affidavit of Matthews*, at ¶ 11; *Affidavit of Weber*, at ¶ 9. We find nothing extraordinary in an employer's decision to involve a management level employee to witness a meeting in which a termination decision is announced to a discharged employee. Accordingly, without more, we have no basis, other than mere surmise, to conclude that Weber's presence, at the time that the Plaintiff was given his termination letter, is a sufficient showing that Weber was actively involved in the discharge decision.

Moreover, we note that the Plaintiff worked in the Operations Department, which was directed by Matthews, and not in the Safety Department, which Weber managed. *Braziel Deposition*, at pp. 50–51, 171; *Affidavit of Weber*, at ¶ 6. Accordingly, Weber never supervised Braziel, nor did he ever evaluate his work performance. *Affidavit of Weber*, at ¶ 7. Indeed, the Plaintiff has not rebutted the Defendant's evidence which demonstrates that Weber lacked the authority to discharge him. *Affidavit of Matthews*, at ¶ 10. Moreover, to the extent the evidence suggests that Weber had input in the decision to terminate the Plaintiff, that input related to a recitation of Weber's view of the law—a view which proved to be correct. See, *Aungst v. Westinghouse Elec. Corp.*, 937 F.2d 1216, 1221 (7th Cir.1991) (decisionmaker consulted with others but "was indisputably the sole decisionmaker"); *La Montagne v. American Convenience Products*, 750 F.2d 1405, 1412 (7th Cir.1984) (statements made by individuals who recommended plaintiff's discharge held irrelevant because decisionmaker "alone decided to discharge"). In sum, the Plaintiff has failed to present competent evidence to rebut Matthew's attestation that he, alone, decided to terminate the Plaintiff. *Frieze v. Boatmen's Bank of Belton*, supra at 541 (statements made by non-decisionmakers cannot create a reasonable inference of age discrimination).[23] There-

---

22. In an Affidavit, Matthews avers that, as head of the Operations Department, "[he] alone was the person responsible for making the decision about [the Plaintiff's] termination." *Affidavit of Matthews*, at ¶ 8.

23. Even if we found that age played a "motivating part" in the Defendant's decision to terminate the Plaintiff's employment, the Plaintiff would still be unable to withstand Summary Judgment, as he has failed to raise a material issue of fact concerning the Defendant's contention that it would have made the same decision even the decision had not been tainted by age animus. As we have noted, when an employee produces direct evidence that age played a motivating part in the employment decision, the em-

ployer can prevail, at the Summary Judgment stage, "only if the record evidence that its employment decision was not based on discrimination is so strong that a reasonable trier of fact must so conclude." *Burns v. Gadsden State Community College*, 908 F.2d 1512, 1519 (11th Cir.1990).

Otherwise stated, "there must be no genuine issue of fact but that the employer would have made the same employment decision even absent the discriminatory motive." *Id.;* see also, *Berlett v. Cargill, Inc.*, 780 F.Supp. 560, 564 (N.D.Ill. 1991). Of course, our holding with respect to the Plaintiff's disability claims has equal application here. The evidence, when viewed in a light most favorable to the Plaintiff, demonstrates that

fore, finding no "direct evidence" of age discrimination, we proceed to the Plaintiff's circumstantial case.

■ Under the *McDonnell Douglas* regimen, if the Plaintiff establishes a *prima facie* case of age discrimination, the burden of production shifts to the Defendant to articulate a nondiscriminatory basis for his discharge. *Garner v. Arvin Industries Inc.*, 77 F.3d 255, 257 (8th Cir.1996). If the Defendant proffers such an nondiscriminatory basis, then the Plaintiff must show that the Defendant's reasons for his dismissal are merely a pretext for discrimination. *Id.; Krenik v. County of Le Sueur*, supra at 958 (to survive Summary Judgment, plaintiff must provide evidence that the defendant's proffered explanation is both incorrect and that discrimination is the true explanation); see also, *Rothmeier v. Investment Advisers, Inc.*, 85 F.3d 1328, 1335 (8th Cir.1996). Here, the Defendant has presented evidence that directly refutes the second element of the Plaintiff's *prima facie* case—namely, whether he met applicable job qualifications. In this instance, it is difficult to separate the Plaintiff's *prima facie* case from the Defendant's nondiscriminatory explanation and the Plaintiff's proof of pretext. Nevertheless, because the Plaintiff has not met his burden of showing that the Defendant's explanations are merely a pretext for discrimination, it is not necessary to decide whether he has also failed to established a *prima facie* case. See, e.g., *Aucutt v. Six Flags Over Mid–America, Inc.*, 85 F.3d 1311, 1316 (8th Cir.1996) (Court assumes existence of *prima facie* case to sustain Summary Judgment on employee's failure to rebut employer's business reasons as pretextual).

With respect to the Plaintiff's job qualifications, the Defendant maintains that, due to the Plaintiff's medical restrictions, he was not qualified for any available position within its organization. In turn, the Plaintiff argues that he need only show that he met the qualifications for the various positions he had been assigned after his accident.[24] We need not, however, resolve the issue of whether an employee, who can perform nonpermanent, light-duty tasks, is "qualified" for purposes of the second element of his *prima facie* case, because the Plaintiff has not shown that the Defendant's proffered explanation for its termination decision is untrue. In other words, evidence that the Plaintiff could perform his light-duty jobs is not material since it does not address whether the Defendant's articulated, nondiscriminatory explanation—that the Plaintiff was physically unable to perform an available, permanent position—was false or otherwise incorrect. Moreover as to this issue, we have previously determined that the Plaintiff has failed to present sufficient evidence to raise an issue of fact concerning his physical capacity to perform work in any available permanent position. Accordingly, we conclude, as a matter of law, that the Plaintiff has failed to rebut the Defendant's nondiscriminatory explanation for its discharge decision. See, *Hutson v. McDonnell Douglas*, supra at 779 (question at pretext stage is whether the Plaintiff has shown that the Defendant's explanation is a pretext for discrimination).

■ In reaching this conclusion, we note that "[t]he touchstone of a claim of disparate treatment under the ADEA, as it is under a number of the other employment discrimination statutes, is intentional discrimination against the plaintiff." *Hutson v. McDonnell Douglas*, supra at 775. In disparate treatment claims, such as that presented here, "the employer simply treats some people less favorably than others because of their protected status." *Hermeling v. Montgomery Ward & Co., Inc.*, supra at 1375, quoting

the Defendant did not have an available position, which satisfied the Plaintiff's medical restrictions and, therefore, his disability precluded his continued employment. Accordingly, even if age had played a "motivating part" in the Defendant's termination decision, we conclude that no genuine issue of material fact precludes our determination that the Defendant would have made the same decision absent the Defendant's asserted animus toward age.

24. However, the case that the Plaintiff cites in support of this proposition, namely, *Hase v. Missouri Div. of Employment Sec.*, 972 F.2d 893 (8th Cir.1992), cert. denied, 508 U.S. 906, 113 S.Ct. 2332, 124 L.Ed.2d 244 (1993), does not support that contention. Rather, in *Hase*, the Court observed that, under the *McDonnell Douglas* framework, a plaintiff is not required to show that she had identical qualifications to the person that the employer eventually hired. *Id.* at 896 n. 1.

*Hubbard v. United Press Int'l Inc.*, 330 N.W.2d 428, 441 n. 12 (Minn.1983), in turn quoting *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). Here, however, the Plaintiff has testified that he was treated neither more favorably, nor less favorably, than anyone else employed by the Defendant. *Braziel Deposition*, at p. 178. Likewise, he readily acknowledged that, in his last year of employment, he was treated no differently than similarly situated employees.[25] *Id.*

Accordingly, we conclude that the Plaintiff has failed to produce either direct or circumstantial evidence which staves the award of Summary Judgment to the Defendant on the Plaintiff's age discrimination claim, and we proceed to his final claim, one for breach of an oral employment contract.

### 2. *The Plaintiff's Breach of Contract Claim.*

The Defendant has also moved for Summary Judgment on the Plaintiff's breach of contract claim. In Count Three of his Complaint, the Plaintiff contends that he had a valid, lifetime, oral employment contract with the Defendant, which the Defendant breached when it terminated his employment. We find this claim to be without merit, as a matter of law.

■ a. *Standard of Review.* Under Minnesota law, "the 'usual employer-employee relationship is terminable at the will of either' party." *Fox v. T–H Continental Ltd. Partnership*, 78 F.3d 409, 413 (8th Cir.1996), quoting *Cederstrand v. Lutheran Bdh.*, 263 Minn. 520, 117 N.W.2d 213, 221 (1962). "However, 'a promise of employment on particular terms, if in the form of an offer and if accepted by the employee for valuable con-

sideration, may create a binding unilateral contract which will alter an at-will contract.' " *Larson v. Koch Refining Co.*, 920 F.Supp. 1000, 1007 (D.Minn.1996), quoting *Ruud v. Great Plains Supply, Inc.*, 526 N.W.2d 369, 371 (Minn.1995), in turn citing *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 626 (Minn.1993).

■ Nevertheless, "Courts are reluctant to find a lifetime employment contract because such alleged contracts are often 'oral, uncorroborated, vague in important details and highly improbable.' " *Aberman v. Malden Mills Industries, Inc.*, 414 N.W.2d 769, 771 (Minn.App.1987), quoting *Degen v. Investors Diversified Services, Inc.*, 260 Minn. 424, 110 N.W.2d 863, 866 (1961); see also, *Pine River State Bank v. Mettille*, supra at 627 ("The law is hesitant to impose this burdensome obligation on an employer in the absence of an explicit promise to that effect."). "It has long been the law of Minnesota that an employer's use of the terms 'permanent employment,' 'life employment,' or employment 'as long as the employee chooses' creates only an indefinite general hiring terminable at the will of either party." *Fox v. T–H Continental Ltd. Partnership*, supra at 414, citing *Skagerberg v. Blandin Paper Co.*, 197 Minn. 291, 266 N.W. 872, 874 (1936).

■ b. *Legal Analysis.* In support of his contract claim, the Plaintiff relies upon various assurances, by certain of the Defendant's employees, that he would be retained despite his work-related injury. *Braziel Deposition*, at pp. 60–73. In this respect, the Plaintiff has testified that he was told, while recuperating in the hospital, not to worry about a job because he was going to have one. *Braziel Deposition*, at 70. He further testified that, upon his return to work, Web-

---

**25.** Notwithstanding this testimony, the Plaintiff argues, in his Opposition Memorandum, that he was not provided a pay raise or a performance evaluation in 1993. During 1993, however, the Plaintiff was on light-duty status, as he was recuperating from his work-related injury. The Plaintiff has failed to present evidence concerning any similarly situated employee, who was denied a pay raise, or who was not provided a performance evaluation. As further evidence of disparate treatment, the Plaintiff contends that he was not given the opportunity to interview for

the Operations Clerk position, although the Defendant interviewed several other individuals. This evidence is not material, however, because the position was never filled. Lastly, the Plaintiff asserts that there were two persons, who were younger than himself, and who the Defendant continued to employ. With respect to these two individuals, however, the Plaintiff testified that he did not know their medical restrictions, and he admitted to not knowing whether they were treated differently than he was, based upon their age. *Braziel Deposition*, at pp. 392–397.

er informed him that "something permanent" would be found. *Id.* at 64. Viewed in a light most favorable to the Plaintiff, these assurances do not establish a clear intent to create a contract for permanent employment, nor has the Plaintiff shown that any consideration was extended as would be necessary in order to enforce such a contract.[26]

Oral representations, which are quite similar to those at issue here, have been found, as a matter of law, to be too indefinite to create an offer for lifetime employment under Minnesota law. Thus, an assurance of a "career position * * * falls far short of establishing a lifetime contract." *Michaelson v. Minnesota Min. & Mfg. Co.*, 474 N.W.2d 174 (Minn.App.1991), aff'd, 479 N.W.2d 58 (Minn.1992), quoting *Degen v. Investors Diversified Services, Inc.*, supra (assurances made to employee that his position was a "career position" was insufficient to alter at-will relationship); see also, *Ruud v. Great Plains Supply, Inc.*, supra (statement that "good employees are taken care of" and "you are considered a good employee" insufficient to constitute an offer, and even were there such an intention, terms are too vague to enforce); *O'Brien v. A.B.P. Midwest, Inc.*, 814 F.Supp. 766, 775 (D.Minn.1992) (statement that "you will always have a job at ABP" not sufficient to constitute an offer); *Aberman v. Malden Mills Industries, Inc.*, supra (employer's statement to employee that "I will always take care of you," "we are offering you security," and "[you will be a] lifetime sales representative" were too general to constitute a contract for lifetime employment); *Dumas v. Kessler & Mcguire Funeral Home, Inc.*, 380 N.W.2d 544, 548 (Minn.App.1986) (supervisor's statements that he and an employee would "retire together" insufficient to alter at-will relationship); *Corum v. Farm Credit Services*, 628 F.Supp. 707, 714 (D.Minn.1986) (employer's

statement that employee would not get rich but would have "job security" was too indefinite to constitute an offer of permanent employment); *Matson v. Cargill, Inc.*, 618 F.Supp. 278, 286 (D.Minn.1985) (employer's statement that there "would always be a place" for employee insufficient to overcome at-will presumption). Of course, the Plaintiff's mere subjective expectation of permanent employment cannot create a contract that conforms to those expectations. *Corum v. Farm Credit Services*, supra at 714–715. Accordingly, we conclude that the Defendant's assurances, as they have been alleged by the Plaintiff, are insufficient, as a matter of law, to constitute an offer of lifetime employment.

Moreover, "[a]bsent a clear intent to form a contract of permanent employment, an employee's claim of a promise of permanent employment will not prevail unless the employee supplies some consideration beyond that which is normally involved in the employment relationship itself." *Corum v. Farm Credit Services*, supra at 713, citing *Pine River State Bank v. Mettille*, supra at 627. See also, *Aberman v. Malden Mills Industries, Inc.*, supra at 772 (evidence of "uncharacteristic consideration" may overcome the at-will presumption). Thus, an employee may purchase permanent employment with "a valuable consideration that is other than and in addition to his services." *Pine River State Bank v. Mettille*, supra at 628, citing *Skagerberg v. Blandin Paper Co.*, supra.

As evidence of such a form of consideration, the Plaintiff points to the fact that he "continued to stay on the job, even though he was free to leave, and [that] he performed every job he was assigned, including those that required him to exceed his medical restrictions." *Braziel's Memorandum in Opposition*, at p. 23. Clearly, this is not the

---

**26.** Prior to his employment with the Defendant, the Plaintiff submitted an employment application which provided that, if hired, he "may be discharged with or without cause whether before or after the 90 day probationary period." *Affidavit of Linda Mealey–Lohmann, Exhibit A, Application for Employment.* Thereafter, on July 21, 1989, the Plaintiff signed a written employment agreement. Notably, that contractual agreement did not provide any guarantees of employment,

and further provided that it could be modified only in writing, by an authorized officer of the Defendant. *Id., Exhibit B, Employment Agreement.* Since we conclude that the alleged assurances of permanent employment fail to establish an enforceable lifetime employment contract, as they are too indefinite and are unsupported by adequate consideration, we need not reach the issue of whether the written agreement bars the effectiveness of an subsequent oral modification.

type of consideration that "is other than and in addition to his services." Cf. *Bussard v. College of St. Thomas, Inc.*, 294 Minn. 215, 200 N.W.2d 155 (1972) (additional consideration supporting construction that parties intended lifetime employment was shares of stock that the employee gave to the employer).

Finding no competent evidence of a contract for permanent employment, we are compelled to grant the Defendant Summary Judgment on this claim as well. *Ward v. Employee Development Corp.*, 516 N.W.2d 198, 203 (Minn.App.1994) (Summary Judgment is appropriate where the alleged facts, accepted as true, do not establish a modification to the at-will relationship), rev. denied (Minn.1994).

NOW, THEREFORE, It is—

ORDERED:

That the Defendant's Motion for Summary Judgment [Docket No. 10] be GRANTED in all respects.